PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name _____ Ayon _____ Jose _____

       (Last)             (First)          (Initial)

Prisoner Number __P-22590_____

Institutional Address __P.O. Box 6000 B6 111  Delano, Ca. 93216__

================================================================

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**(PR)**

__Jose Ayon_____ Case No __**CV 08    00657**__
Full Name of Petitioner    (To be provided by the clerk of
                     court)           **MJJ**

      vs.

__Tony Hedgpeth - Warden___   PETITION FOR A WRIT OF HABEAS CORPUS
Name of Respondent
(Warden or jailor)

================================================================

### Read Comments Carefully Before Filling In

#### When and Where to File

    You should file in the Northern District if you were convicted and sentenced in one of these counties:  Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located.  If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined.  Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

~~If you are not presently in custody pursuant to~~ the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

| Humboldt County Superior Court | Humboldt County, Ca. |
|---|---|
| Court | Location |

(b) Case number, if known ___982332___

(c) Date and terms of sentence __12-9-98  17 years__ .

(d) Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes _X_ No ____

Where? __Kern Valley State Prison  P.O. Box 6000  Delano, Ca.__
         (Name of Institution)                    (Address)

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

__Manufacturing Methamphetamine(HS 11379.6), Weight Enhancement(HS__

__11379.8), Conspiracy(PC 182), Disposal of Hazardous Waste(11374.5)__

3. Did you have any of the following?

Arraignment: Yes _X_ No ____ Preliminary Hearing: Yes ____ No _X_

Motion to Suppress: Yes _X_ No ____

2

4.    How did you plead?

Guilty _____    Not Guilty __X__    Nolo Contendere _____

Any other plea (specify) _____

5.    If you went to trial, what kind of trial did you have?

Jury __X__    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?    Yes _____    No __X__

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment    Yes __X__    No _____
(b)    Preliminary hearing         Yes _____    No _____
(c)    Time of plea    Yes __X__    No _____
(d)    Trial    Yes __X__    No _____
(e)    Sentencing    Yes __X__    No _____
(f)    Appeal    Yes __X__    No _____
(g)    Other post-conviction proceeding    Yes __X__    No _____

8.    Did you appeal your conviction?    Yes __X__    No _____

(a)    If you did, to what court(s) did you appeal?

| | | | Year | Result |
|---|---|---|---|---|
| Court of Appeal | Yes __X__ | No _____ | 2000 | Affirmance |
| Supreme Court of California | Yes __X__ | No _____ | 2000 | Denial |
| Any other court | Yes _____ | No __X__ | | |

(b)    If you appealed, were the grounds the same as those that you are raising in this petition?    Yes __X__    No _____

(c)    Was there an opinion?    Yes __X__    No _____

(d)    Did you seek permission to file a late appeal under Rule 31(a)?    Yes _____    No _____

If you did, give the name of the court and the result:

_____

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes __X__    No _____

3

Note:  If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition.  You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28 U.S.C. § 2244(b).

(a)  If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding.  Attach extra paper if you need more space.

I.    Name of Court  UNited States District Court—Northern District

      Type of Proceeding  Habeas Corpus

      Grounds raised (Be brief but specific):

      a.    Improper Weight Enhancement

      b.    Unlawful Search and Seizure/Ineffective Counsel

      c.    Unjustified Physical Restraints at Trial

      d.    Failure to Disclose Informants/Perjury

      Result  Dismissal w/o Prejudice    Date of Result  11-8-06

II.   Name of Court  California Supreme Court

      Type of Proceeding  Habeas Corpus

      Grounds raised (Be brief but specific):

      a.    Unlawful Search and Seizure

      b.    Unjustified Restraints

      c.    _____

      d.    _____

      Result  Denial                    Date of Result  1-17-07

III.  Name of Court  California Supreme Court

      Type of Proceeding  Habeas Corpus

      Grounds raised (Be brief but specific):

      a.    Same as those raised in this petition.

b. _____

c. _____

d. _____

Result ___Pending_____        Date of Result _____

     (b)  Is any petition, appeal or other post-conviction
proceeding now pending in any court?     Yes _X_    No ____   .

California Supreme Court San Francisco, California.
_____
               (Name and location of court)

## B.  GROUNDS FOR RELIEF

    State briefly every reason that you believe you are being
confined unlawfully.  Give facts to support each claim.  For example,
what legal right or privilege were you denied?  What happened?  Who
made the error?  Avoid legal arguments with numerous case citations.
Attach extra paper if you need more space.  Answer the same questions
for each claim.

    Note:  You must present ALL your claims in your first federal
habeas petition.  Subsequent petitions may be dismissed without review
on the merits.  28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467;
111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

    Claim One: __See attached pages._____

_____

    Supporting Facts: _____

_____

_____

_____

    Claim Two: _____

_____

    Supporting Facts: _____

_____

_____

_____

5

GROUND ONE-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS
WAS VIOLATED BECAUSE HIS CONDUCT DID NOT COME WITHIN MEANING OF
THE STATUTE.

Petitioner's conviction for manufacturing methamphetamine was en-
hanced by 10 years under Health & Safety Code Sec. 11379.8 which
requires enhancement if the substance exceeds 25 gallons of liquid
or 10 pounds of solid substance.  However, only two ounces of meth-
amphetamine was recovered(RT-1375).  A witness testified he had
seen a quantity of meth but no evidence established the weight.
The Court of Appeal upheld the enhancement notwithstanding the ab-
sence of 10 pounds of existing meth and caselaw indicating 11379.8
was inapplicable(attached exhibit (att.ex.) A at 18-23; see People
-v-Lopez 20 C.A.4th 897,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; Valenzuela-v-Superior Ct. 33
C.A.4th 1445,1450-1995).

GROUND TWO-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS
WAS VIOLATED BY CONVICTION ON INSUFFICIENT EVIDENCE.

The prosecution failed to produce sufficient, or any, evidence of
sufficient meth in liquid or solid form to satisfy Section 11379.8.

GROUND THREE-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE
PROCESS, IMPARTIAL JURY, AND EFFECTIVE COUNSEL WERE VIOLATED BY
HIS UNJUSTIFIED LEG RESTRAINTS AT TRIAL.

Petitioner and his codefendants were fitted with security leg

braces under their clothing(RT-304-05). The restraints, which
could not be seen and were made of vinyl, steel, and cloth, could
be heard by jurors because they made a distinct "clicking" sound
when a defendant walked(att.ex. A at 29). The restraints were
very painful and caused the defendants to walk oddly, another
circumstance alerting jurors to the restraints' presence(RT-269-
74). Because of the restraints, Petitioner was unable to give
his full attention to the proceedings or communicate with his
attorney(att.ex. B & C(Declarations of Petitioner and his trial
attorney)). The Trial Court acknowledged there was no evidence
of a risk of violence, escape, or other disruptive conduct on the
defendants' part. Rather, the restraints were pursuant to an
indiscriminate policy(RT-277-78). The Court of Appeal concluded
the restraints were error(att.ex. A at 33-34).


GROUND FOUR-PETITIONER'S FOURTH AMENDMENT RIGHTS AGAINST UNLAWFUL
SEARCH AND SEIZURE WERE VIOLATED.


A van containing Petitioner was stopped by sheriff's deputies and
other law enforcement. Petitioner and his codefendants were or-
dered out, handcuffed, and made to remain at the side of the road.
Information obtained during the search and stop led to the searches
of the property and another residence wherein incriminating evi-
dence was found(att.ex. A at 12). The decision to stop the van
was based on the following (1) the van had departed late at night
from a property where informants had months earlier reported drugs
were being manufactured, (2) the van had been rented in Fresno,

a place informants had stated the manufacturers were from. However, law enforcement only learned the van was rented in Fresno after illegally entering the property and recording the license plate(att. ex A at 8). Based on evidence at the suppression hearing and the trial(see RT-1504-05,1505-08), the stop and searches violated the Fourth Amendment as they lacked probable cause, reasonable suspicion and valid consent. The information from the informants was stale and the informants were not shown to be sufficiently reliable or corroborated or even to exist. The search warrants contained material misrepresentations(att.ex. A at 9-10). The suppression hearing was not full and fair(RT-251-53,208-33,1848).

GROUND FIVE-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT AGAINST EX-CESSIVE BAIL UNDER THE EIGHTH AMENDMENT WAS VIOLATED.

The Trial Court refused to reduce Petitioner's outrageously high and unjustified two million dollar bail. The sole basis was that the defendants were illegal aliens and, if they made bail, would allegedly leave the country and never return. However, Petitioner would never have left his wife and children who live here and are American citizens(RT-14-16).

GROUND SIX-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE PRO-CESS, CONFRONTATION, EFFECTIVE COUNSEL AND AGAINST UNREASONABLE SEARCH AND SEIZURE WERE VIOLATED.

The detentions, arrests, warrants, and searches were based sub-

stantially on information from confidential informants(RT-10-11,17-
18,34-36,54-56,63,87-88,107-09,111-14,125, 141-43,161-63).    The
informants and information were unreliable, uncorroborated, and the
information was stale, thus invalidating the searches and seizures.
The Trial Judge erred in upholding the confidentiality of the
informants' identities and/or the information provided by them
(RT-251-53; att.ex. D(Motion)).    The sealed information would not
have revealed the informants' identities.    The informants were
(1) material witnesses on guilt or innocence and (2) provided
material misrepresentation relied upon by law enforcement.    The
in camera procedure utilized by the trial judge(RT-133,208-33)
violated Due Process, the right to Confrontation, and the Fourth
Amendment.    Appellate Counsel failed to challenge the procedure
or the Trial Court's ruling on confidentiality.

GROUND SEVEN-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE
PROCESS AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED.

The trial court imposed a ten year enhancement under Section 11379.8
which the Court declined to strike as authorized by Subdivision
(d)(RT-2302-012).    This was an abuse of discretion and violated
Petitioner's rights.    Petitioner's seven year sentence for manu-
facturing was more than adequate punishment.    Evidence indicated
he was a young man with just a minor role of a footsoldier.    The
crime involved no violence.    There was no evidence he was aware
of either the penal consequences of manufacturing or the effects
on society.

Claim Three: _____

Supporting Facts: _____

_____

_____

_____

   If any of these grounds was not previously presented to any other
court, state briefly which grounds were not presented and why:

_____

_____

_____

_____

   List, by name and citation only, any cases that you think are
close factually to yours so that they are an example of the error you
believe occurred in your case.  Do not discuss the holding or
reasoning of these cases:

 Jackson-v-Virginia 443 U.S.307.  Roviaro-v-U.S. 353 U.S. 53.

 Dyas-v-Poole 317 F.3rd 934-9th Cir.  Ramirez-v-Castro 365 F.3rd 755.

 Illinois-v-Gates 462 U.S. 213.

   Do you have an attorney for this petition?   Yes _____   No  X
   If you do, give the name and address of your attorney:

_____

   WHEREFORE, petitioner prays that the Court grant petitioner
relief to which s/he may be entitled in this proceeding.  I verify
under penalty of perjury that the foregoing is true and correct.

Executed on ___1- 9-08___            _____Jose Ayon_____
                Date                   Signature of Petitioner

(rev. 5/96)

6

# EXHIBIT COVER PAGE

A

EXHIBIT

Description of this Exhibit: Court of Appeal Opinion

Number of pages to this Exhibit: 46 pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

_ . COPY

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

    v.

MANUEL NUNES MARTINEZ,

    Defendant and Appellant.

A084742

(Humboldt County Super.
Ct. No. CR982332DS)

THE PEOPLE,

    Plaintiff and Respondent,

    v.

JORGE PAEZ AGUIRRE,

    Defendant and Appellant.

A084909

(Humboldt County Super.
Ct. No. CR982332AS)

THE PEOPLE,

    Plaintiff and Respondent,

    v.

FELIPE CARRASCO MADUENO,

    Defendant and Appellant.

A085103

(Humboldt County Super.
Ct. No. CR982332CS)

THE PEOPLE,

    Plaintiff and Respondent,

    v.

JOSE ALBERTO AYON

A085315

(Humboldt County Super.
Ct. No. CR9823332BS)

Indicted by grand jury, Jorge Paez Aguirre, Jose Alberto Ayon, Felipe Carrasco Madueno and Manuel Nunes Martinez stood jury trial together on charges of unlawfully manufacturing methamphetamine (Health & Saf. Code, § 11379.6, subd. (a); Pen. Code, § 1203.073, subd. (b)(3)) in excess of 10 pounds (Health & Saf. Code, § 11379.8), con-

1      EXHIBIT A (46 pgs)

spiracy to manufacture the drug (Health & Saf. Code, § 11379.6; Pen. Code, § 182, subd. (a)(1)) and disposing of a hazardous material that is a controlled substance (Health & Saf. Code, § 11374.5). The jury found each defendant guilty on all counts and found true the weight allegation. The court sentenced each to a total of 17 years in prison, consisting of an upper, 7-year term for manufacturing, 10 years more for the weight enhancement, a stayed term (Pen. Code, § 654) of 7 years for the conspiracy, and a concurrent term of 4 years for the hazardous material count. Each defendant appeals. We will affirm.

## BACKGROUND

The case involved a methamphetamine lab operated in a rented cabin in the Swain's Flat area of Humboldt County. It was uncovered through coordinated efforts by the Humboldt County Drug Task Force (Task Force), California Department of Justice Bureau of Narcotics Enforcement (BNE), Humboldt County Sheriff's Department and a county marijuana eradication team. The cabin and 75 acres of land, located off Highway 36 at Swain's Flat near Bridgeville, was owned by Ken Cordry and rented to Don Casey.

᾿ Confidential tips about a lab being operated on the Casey property by several Hispanic men, including defendants Ayon, Madueno and Martinez, led to surveillance at a gated road leading to the property and then, near 3 a.m. on April 16, 1998, the stop of a maroon van that had just left the property. In the van were defendants and a fifth man, Efren Mora. Officers secured the property and, later searching it pursuant to a warrant, discovered equipment, chemicals and chemical waste indicating a large scale operation. They had also by then arrested Casey at the property and done a consent search.

Fingerprints on some equipment implicated defendants, as did chemically burned and stained pants worn by Ayon. Casey cooperated with the officers, turned over two ounces of the finished drug he had been given (along with cash) for use of the property, and implicated defendants, Mora, Carlos Alvarez, leader Ramon (not Manuel) Martinez (a.k.a. Tony) and main "cook" Pepe, as men all involved in the operation the night before. A search of a Rio Dell apartment of Alvarez turned up further drug evidence.

Tony and Pepe were never apprehended. Pepe had left in a Cadillac around the same time as the van. Alvarez fled into the woods with Ramon Martinez. Alvarez and

2

Casey were apprehended and charged but testified for the People at trial after pleading no contest or guilty in return for their testimony and a promise of probation. Mora was a codefendant until he pled no contest at the start of trial.

Alvarez testified that he, Mora and defendants Aguirre, Madueno and Martinez stayed in a single room at the Super 8 Motel in Fortuna on the two nights before the 15th. Tony, Aguirre and Martinez had picked up Madueno and himself and driven him there. Tony had given him the money for the room. On the second morning, Ayon came and Tony drove Alvarez in a maroon van (a 1993 Aerostar) to a Safeway where Tony gave him money to buy ten 20-pound bags of ice. They drove back to the room, and Alvarez drove them all to the cabin, dropping them off around 10 a.m. Alvarez helped load the bagged ice into a pickup truck at a gate on the dirt road leading to the cabin. Tony told Alvarez to come back that night at 10:30 or 11 p.m., and Alvarez went back to the motel room and then to a girlfriend's house in Arcata. He returned to the property around 11 p.m. and waited awhile at the locked inner gate but saw no one. Eventually, he walked up toward the cabin and was met by Mora, who came down in a truck and drove him the rest of the way up.

Alvarez saw people sitting around at the cabin drinking beer. Defendants, Tony, Casey and Pepe were there, too. Alvarez helped some of them move drums, buckets and chemical containers to a shed behind the cabin and then sat to talk and drink a couple of beers himself. Everyone except Casey then piled into the truck and went back down to the gate. Near the van was a gray Cadillac that had not been there before. It was parked with its engine running and lights out, and a Hispanic-looking man sat behind the wheel. Alvarez and Tony were supposed to leave in the Cadillac, but this did not happen; for as others left in the van and went eastbound toward Bridgeville, Tony saw another car take off right behind it and laterted others that it could be the police. The Cadillac then sped off—with Pepe the only passenger—and turned the opposite direction, westbound toward Eureka. Tony and Alvarez walked the long distance back up to the cabin. Tony told Casey they had to move the "chemicals and stuff" because the cops might be coming. Casey gave them metal containers and some round glass flasks ("glass balls") from under

3

the porch, which they hid in the woods. Then, when a white truck or Bronco suddenly pulled up behind Casey and his truck, Tony and Alvarez ran into the woods. Tony later used a cell phone to call one of his friends to pick up Alvarez and himself.

Alvarez had first seen the maroon van two days earlier, when Tony drove up in it with Martinez and Aguirre. The van had no containers in it at that time, just two duffel bags of clothes. Alvarez had known Tony for several months and had driven him out to the Casey cabin a couple of times earlier that year. He had met Tony through Madueno, whom Alvarez hung out with in Ukiah, and Tony had stayed over at his place in Rio Dell, which Alvarez shared with Mora. Twice Tony had left a large orange drum in a shed there. Madueno, who had a brother in Ukiah, would also come by and sleep over some-times. Alvarez knew Tony was selling methamphetamine and had been told he had made it at the cabin some three months before. Tony had told Alvarez he was supplying Casey with the drug. Alvarez had also heard that Pepe knew how to "cook" methamphetamine. Alvarez did not see any of the drug at the cabin during this incident and did not see any scales. He was arrested on the Monday afterward and, he admitted at trial, lied to police who had interviewed him.

Casey testified at first that eight people—defendants, Pepe, Tony, Cruz (Alvarez) and Fred (Mora)—were at his cabin when he left for work at 7 a.m. on April 15th, were in the process of manufacturing methamphetamine, and had been there for three or more days. They were also there (except for an initial absence of Tony and Cruz) when he returned sometime from 6:30 to 8 p.m. He had an arrangement with Tony to be paid—partly with two ounces of the drug and partly in cash—for the use of his cabin to "make speed." (Casey admitted having snorted methamphetamine each morning for the past two years.) Tony had also paid him for three or four other times since January. Casey had made $4,000 to $5,000 total and, after his arrest, turned over to police $1,800 he still had. That night he saw the men tending to a big stainless steel pot cooking on a propane heater on the porch, and an extension cord ran from his electric generator to the outhouse, where he assumed there were other cookers. The men had used his Dodge Ram to bring up equipment and chemicals three days earlier. By the time he got home from work on

4

the 15th, they were finishing the cooking and in the process of weighing the drug out and cleaning up. He saw two large glass beakers washed and drying against a fence.

He did not see the maroon van on his way up the dirt road to the cabin from Highway 36 that night, but it was dark by then. Defendants were milling around cleaning up. Tony and Pepe had scales for weighing the finished drug, and he saw a quantity the size of a loaf of bread broken down into one-pound increments wrapped in saran. Casey went to bed between 10 and 12 p.m. and was awakened by Tony around 3:30 a.m. All eight of the men got into Casey's brown truck and went down the hill to the gates. About an hour later, Tony and Cruz came back and told him the police had stopped one of the cars. They took the beakers from a loft in the cabin before leaving on foot. When Task Force officers arrived and arrested him, Casey cooperated and turned over the two ounces of methamphetamine and the cash he still had. (Earlier in the process, the men had been taking bottles of pills and pouring them into a garbage can to soak in water; they had been stalled for a day or so by not having one chemical.)

Casey qualified his recollection about which defendants he saw and when—on April 15 and at four prior "cooks" (each lasting three or four days) at the cabin since late January. Four people had been involved in the prior cooks: Tony, who organized them; Pepe, "the main cook"; Eric, the name by which he knew Ayon; and Madueno, who was there "[e]very time." Cruz and two others had been there at times. This last time was the first he had seen Aguirre or Martinez, and he did not recall seeing them until the evening of the 15th. That morning, he had given Cruz a ride to town, and he saw Tony, Madueno, Pepe, Mora, and Eric at the cabin. That night, Aguirre and Martinez were there when he got home; Tony and Cruz showed up later. He had not paid much attention and recalled little more than Aguirre standing around out front where the car was parked; Aguirre may have been down by the outhouse, as he moved around quite a bit, but was not measuring or cutting up the drug. As for Martinez, Casey might have "seen him once before" but could not "recall for sure." Martinez and Aguirre were standing out where he parked his car "talkin'" when he drove up. Martinez went inside the cabin at one point; Aguirre did not but was "standin' on the front porch watchin'" as the weighing and cleanup went on.

5

Casey did not notice a spill of reddish waste in a pit some 20 feet from his front door and 40 feet from where he parked his car. He was sure he would have noticed it had it been there the night before. Still, a rise in the ground obscured the view from the porch and it was dark when he came home that night. The last time he had examined the area in daylight would have been on the weekend, that last Sunday. He had not seen it then.

Madueno testified in his own defense. He said he had traveled to the area from Idaho to visit friends, including a girlfriend and Alvarez. He stayed with the girlfriend in Arcata, and one day Alvarez drove him, Ayon and another man out to the property. He thought at first they were going to Alvarez's house in Rio Dell for a party, but Alvarez told them he had to pick someone up and drove out Highway 36 to the cabin. Alvarez brought out some beer, and Madueno stayed outside talking to Ayon. Martinez, whom Madueno also knew, arrived about 20 minutes later and spoke of giving somebody a ride to Ukiah. After everyone got a ride to the gate in a pickup, Madueno got in the van with the four others to go to Ukiah. He heard no one discuss methamphetamine.

Aguirre and Manuel Martinez, brothers-in-law, each testified. Aguirre, who lives in Fresno, said that Martinez invited him to go up north to look for work and picked him up in a tinted-window maroon van Martinez said he had rented. There was no equipment in it. Martinez got them a hotel room in Humboldt County (he could not say where), and someone came and borrowed the van from Martinez and returned it hours later with a lot of cans and things inside that had not been there before. They drove around for two days looking for work but found none and decided to go back to Fresno but, after showering, both fell asleep. Martinez woke him late that night saying they were leaving and had to pick someone up. Aguirre slept during the ride and fell asleep again, in the back, after they picked up three men. The next thing he knew, police had stopped them. He did not know Casey, Tony, Ramon Martinez, or where Casey lived, and he never made or agreed to make methamphetamine. He did not even know what methamphetamine was. His fingerprints could have gotten onto some of the cans left in the van.

Martinez testified that he rented the van to take his family to Yosemite but decided to look for work in Humboldt County, where he had worked before. He got a hotel room

6

for himself and Aguirre at a Motor Lodge in Fortuna, where a friend (Martin Carrasco) borrowed the van overnight to move some things. Martinez had earlier met with Ayon, at a mall, to ask for help in filling out job applications. Around midnight, after a fruitless day of job hunting with Aguirre, Martinez got a beeper call from Ayon. Ayon wanted to be picked up and gave directions to a gated road off Highway 36. Martinez had never been there before and, when Ayon did not appear, climbed the gate and walked toward a cabin up the hill. Ayon met him before he got there, and there were several men standing outside, only one of whom—Madueno—Martinez knew. Everyone seemed to be leaving. They rode in a pickup truck back down to the gate. He let Ayon drive, and officers stopped the van a short time later.

Ayon did not call witnesses or testify. More facts are set out later in this opinion.

### DISCUSSION

Each defendant submits his own briefing but adopts his codefendants' arguments by reference (Cal. Rules of Court, rule 13). We address them together, differentiating between defendants only where necessary.

### I. *Suppression Motion*

Defendants, plus then-defendants Mora and Alvarez, joined in a written pretrial motion to suppress evidence (Pen. Code, § 1538.5) authored by Madueno, and the matter was heard by Judge Timothy P. Cissna on June 30 and July 1, taken under submission, and then denied on July 7, 1998. Judge Cissna deemed the arguments made by various counsel below to have been advanced by all defendants, regardless of the source. All defendants in these consolidated appeals now challenge the ruling.

The briefing proceeds unaware, apparently, that we have already upheld this ruling once. Mora raised the same attack on appeal from his plea-based judgment (A084430); we rejected it and affirmed in an unpublished opinion filed September 24, 1999. Given that all four defendants here joined below in the same hearing and arguments with Mora and offered no pertinent factual distinctions between themselves, it appears that they may be barred by collateral estoppel or law of the case from mounting their own challenges. (Cf. *People v. Caserta* (1971) 14 Cal.App.3d 484, 485-486 [disposition of suppression

7

ruling on separate appeal by wife held not law of the case as to husband, where he had not joined in wife's motion below].) However, since no one has briefed this issue, we proceed to the merits of the challenges and, as before, uphold the ruling.

**The hearing.** The parties disagree initially over what part of the record we may consider in reviewing the ruling. The People limit themselves to evidence adduced at the special hearing on the motion whereas defendants also cite later testimony from trial and other hearings. In response to protest by the People that this is improper, Madueno cites no pertinent case authority but urges that we not "turn a blind eye" to all of the evidence, and he unrepentently continues, in his reply brief, to cite the trial testimony. The People are correct. "[A] motion to suppress in the trial court is a de novo hearing and only evidence adduced at that hearing can be considered in deciding the validity of defendant's motion." Later trial testimony must be ignored (*People v. Vega* (1970) 12 Cal.App.3d 970, 972-973; *People v. Superior Court* (1970) 3 Cal.App.3d 476, 482, fn. 3), for reasons of fairness. For a trial court, it is unfair to test a ruling by evidence not before the court when it ruled. For parties (including codefendants), unless a defendant properly moved to reopen a hearing for statutorily specified circumstances (*People v. Gibbs* (1971) 16 Cal.App.3d 758, 761; *People v. Bishop* (1993) 14 Cal.App.4th 203, 209), they have no incentive to clarify or explore any discrepancies affecting already-decided suppression issues. Accordingly, we must disregard the many improper citations by defendants to evidence outside the suppression hearing (Cal. Rules of Court, rule 18)—certainly anything after page 253 of the reporter's transcript, where Judge Cissna ruled on the motion.

Three participants in the Task Force operation testified. They were Deputies Timothy McCollister and Gary Cooper of the sheriff's department, and Special Agent Wayne Cox from the City of Eureka Police Department. The Task Force investigation began with an informant's tip, and there were ultimately three informants. Defendants refer to them as "confidential," and we adopt that terminology in hereafter referring to them as $CI_1$, $CI_2$ and $CI_3$. However, we do not imply by this that they were "anonymous" for Fourth Amendment purposes. (See generally *Alabama v. White* (1990) 496 U.S. 325, 329.) As will appear, the testifying officers *knew* the informants' identities. The label

"confidential" attaches because the People invoked privilege below, and a joint defense motion to disclose identities (Evid. Code, § 1040 et seq.) for discovery purposes (*People v. Luttenberger* (1990) 50 Cal.3d 1) was ultimately denied. That ruling is not properly challenged on these appeals.[1]

The initiating tip from $CI_1$ came to Cox in October 1997. $CI_1$ told him that several Hispanic subjects, including Jose Ayon, Felipe Madueno and Ramon Martinez were involved in manufacturing methamphetamine at a remote location somewhere off Highway 36, near Bridgeville. $CI_1$ revealed his/her basis of knowledge, and Cox (careful not to reveal identity below) verified it "as being reliable or true through other sources." In return, Cox provided $CI_1$ with "consideration" in a pending criminal matter; Cox did not know of any prior criminal history. During the ensuing investigation, Cox spoke several times with $CI_1$ about the lab, and at some point $CI_1$ told him the Hispanic subjects "were from out of the area, to include the Fresno area."

A second tip, from $CI_2$ ("not the same person" as $CI_1$), came to Cox through McCollister a few months before the raid at issue here, perhaps in January 1998. The tip was that there was a possible drug lab on Casey's property operated by "Mexicans." McCollister had known $CI_2$ for about a year. He/she was "just a normal citizen" and to McCollister's knowledge had no criminal background, or conflicts or dispute with Casey. $CI_2$ had previously given him information about someone driving drunk on a suspended license, and while McCollister had not made any arrest based on that information, he did feel from talking with other people that the information was probably valid. McCollister relayed this latest tip to Cox within a day and spoke with Cox about the investigation.

This tip, both officers knew, contained information from a third person, $CI_3$. McCollister knew $CI_3$'s identity but had not spoken with him/her directly. He did not think $CI_3$ had any dispute with Casey but had not specifically checked into $CI_3$'s back-

---

[1] Martinez and Madueno each perfunctorily state, in identical footnotes and without any heading or factual or legal analysis, that the denial of disclosure was "error." The point is inadequately presented and merits no further response from us. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214, fn. 11; *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2; see also *Balestreri v. Holler* (1978) 87 Cal.App.3d 717, 720.)

9

ground. Cox knew the identity of $CI_3$, too, and was not aware that he/she had any prior relationship with the Task Force.

McCollister knew of the Casey property, knew that Casey had rented it for years from Cordry, and described it to Cox several times during the investigation. Cox, who had extensive expertise in methamphetamine lab operations, felt "[e]verything about the location was ideal for the manufacturing of methamphetamine." It was a very remote, wooded place with no other homes nearby, and the main road itself was remote, with the cabin at the end of a long driveway that led a mile up a hill. The dirt driveway began 150 to 200 yards off Highway 36 at a gravel area 50 yards from a turnoff to Swains' Flat Outpost—a café and store with gas pumps and RV spaces. A wooden gate stood at the entrance to the driveway, and 200 to 300 yards further up stood a metal gate at a parking turnout. Traversing the "wretched," rutted portion beyond the metal gate would require a four-wheel-drive vehicle, and the cabin was not visible from the metal gate.

On the night of April 15th, Task Force officers including Cox staked out the Casey property while McCollister hosted a command post in his home in Carlotta a few miles to the west, off Highway 36, with at least seven other officers. McCollister was monitoring "radio traffic" about the surveillance. Late that night, McCollister was told that there was possible drug lab activity by Mexicans up at the cabin and that a maroon van with license plate 3TSS594 was parked at the second gate; because he had the only marked vehicle, McCollister was to stop the van should it leave. Deputy Cooper, who had discovered the van earlier that evening, was at the command post and discussed it with McCollister. Cooper and others had been dropped off at the first gate. Cooper walked up to the second gate, which was padlocked, saw the van, recorded its license plate number and walked beyond the metal gate about halfway to the cabin, until he saw a brown haired white man out walking with a dog. Cooper stayed out of view and returned with the other officers to the surveillance point near the end of the driveway. The road was muddy from rain, and ✱ the night was moonless; the officers had intermittently used night vision goggles to see.

Cox had run a vehicle check and found the van registered to U-Save Auto Rentals in Fresno. He knew from training and experience—some of which focused specifically

10

on methamphetamine trafficking in California by Mexican nationals—that participants commonly travel roads in the late night or early morning hours, when there is less law enforcement, and rent vehicles to conceal their identities from police and avoid having their own property seized should they be caught.

Around 2:45 a.m., an Agent Lerner radioed that two vehicles had left the Casey property, the maroon van going eastbound on Highway 36 and the other, a sedan, going westbound. Lerner radioed that he would follow the van. McCollister was ordered to make a traffic stop on the van and left with Agent Kirkpatrick in his marked car (a Ford Bronco), headed eastbound on Highway 36, still monitoring radio traffic. Cox, who was in a patrol car eastbound on same highway but behind McCollister, had been part of the decision to order the stop. He had acted based on the departure and the prior information.

Cox's suspicions were heightened when he heard, in Lerner's next radio transmission, that the van had pulled off the highway at Bridgeville, made a U-turn and headed back. Cox knew it was common for drug traffickers to use U-turns and other erratic driving to determine if they were being followed by law enforcement and to compromise surveillance, especially when arriving at or leaving a secret location.

The van was now westbound, headed toward the approaching marked car driven by McCollister. The road was scarcely traveled at that season and time of the night, and McCollister had seen only one other car so far. Now he saw the van approach and pass him. He made a U-turn (ahead of a third car coming westbound further behind the van) and went after the van with his lights activated. He could not see any occupants, but the van matched the color and plate number he had been given. The van made no illegal maneuver and yielded normally to a stop on the roadside, about three miles from the Casey driveway.

McCollister effected what he termed a "traffic enforcement stop" or "felony car stop." He parked behind the van. Neither officer approached but, using their open car doors as shields, knelt behind them with guns trained on the van. It was dark except for the Bronco's headlights and spotlight. McCollister ordered the driver out and "proned [him] out" on the shoulder of the road. He then ordered the occupants out one by one

until a fifth occupant announced that there were no more. McCollister saw that the men appeared to be Hispanic. "[S]hortly" after the stop—within a minute or two, McCollister recalled—a second vehicle arrived. He did not think everyone was out of the van yet, although this was "possible." More agents arrived soon.

Cox had been monitoring the stop by radio and recalled arriving in "[j]ust a few minutes," when "everybody was already out of the van sittin' on the curb." The discovery of five people in the van fueled his suspicions because he knew it generally takes a small group to complete the manufacturing process. Cox identified Madueno and Ayon as two of the three people named by $CI_1$ in the first tip. Cox and his partner also saw staining and pinhole burns on black Adidas sweatpants Ayon wore. To Cox, the stains looked like iodine and the burns were like those created from hot solution while making methamphetamine; he suspected the men had "just concluded with the manufacturing of methamphetamine." The hearing testimony is ambiguous as to whether the suspects were handcuffed then or had already been handcuffed; Cox simply replied, "Yes, sir," when asked, "At that point, were all five handcuffed and detained?"

Cox stayed with the van. McCollister went to the Casey property, drove up to the cabin and secured it pending application for a search warrant. Plain view observations were made there, and warrant searches of the cabin and Alvarez's residence followed.

Counsel for defendants argued, for the most part, that the tips were stale and not sufficiently corroborated, that reasonable suspicion to stop and probable cause to arrest were lacking, that any detention became an arrest before probable cause arose, and that the *Harvey/Madden* rule requiring corroboration for certain information received through official police channels (*People v. Harvey* (1958) 156 Cal.App.2d 516; *People v. Madden* (1970) 2 Cal.3d 1017) was not satisfied. Except for the *Harvey/Madden* claim, which is not repeated, those are essentially the same claims raised now on appeal.

In denying suppression, Judge Cissna ruled: "Deputy McCollister made a traffic stop on the vehicle in which the five defendants were riding. While this is technically an arrest, it has been held to be treated as a temporary detention for Fourth Amendment purposes. Therefore, there must be a showing of a reasonable suspicion under all of the

12

circumstances that the person or persons are or have been engaged in criminal activity. In this case, law enforcement had information from three confidential informants that Mexicans from Fresno were involved in the manufacture of methamphetamine at the Casey residence, although that information was somewhat dated. They further had information that the Casey residence is in a very secluded area of a remote part of Humboldt County with no other residences on that road; that the van in question was parked late at night on the road below the Casey residence, below the portion which would require four wheel drive; that the vehicle was rented in Fresno; and that the vehicle left late at night, originally drove eastbound and then turned around and headed west.

"Under these circumstances, I find that the officers had a reasonable suspicion that the occupants in the van had been involved in criminal activity. I further find that the requirements of the Harvey-Madden Rule were satisfied by a sufficient showing of reliability of . . . the information. After the initial stop, the officers gained the following additional information: First, that three of the occupants were persons who had been identified as having been involved in the manufacture of methamphetamine from previous information and that one of the occupant's clothing had stains and burn holes which were consistent with the manufacture of methamphetamine. I, therefore, find that the officer had probable cause to arrest the vehicle occupants for a felony."

**Analysis.** "The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.) Independent judgment governs selection of the applicable law. (*People v. Alvarez* (1996) 14 Cal.4th 155, 182.) Federal constitutional standards control whether we suppress evidence. (*People v. Woods* (1999) 21 Cal.4th 668, 674; Cal. Const., art. I, § 28, subd. (d).)

As to selection of the law, defendants claim Judge Cissna was confused, applying detention standards after finding "technically an arrest." No error appears. By "technically an arrest," the judge meant he did not find this *initially* to be an "arrest" for Fourth

Amendment purposes, and he made this clear in stating earlier: "I think it's a two-step process. In the original step, there may be considerably more than a typical traffic stop where an officer comes up to the window and says, roll down your window. I want to talk to you for a few seconds. But it -- it's still a detention, I think, initially and certainly *becomes* an arrest." (Italics added.)

As part of their effort to show the initial stop and "pron[ing]" to be an arrest, defendants cite the language of Penal Code section 835 that "[a]n arrest is made by an actual restraint of the person, or by submission to the custody of an officer." However, this general language, written decades before the advent of modern Fourth Amendment jurisprudence, is not analytically helpful. "[C]ontrary to the language of section 835, case law teaches that physical restraint does not convert a detention into an arrest if the restraint is reasonable under the circumstances." (*People v. Rivera* (1992) 8 Cal.App.4th 1000, 1008.) The section actually tends to mirror the test of "seizure" under the Fourth Amendment, which is whether, in view of the full circumstances, a reasonable person would have believed that he was not free to leave, and in fact was seized or submitted to authority. (*California v. Hodari D.* (1991) 499 U.S. 621, 627-628.) Since a *detention* requires this same level of restraint (*Whren v. United States* (1996) 517 U.S. 806, 809-810]), that restraint cannot always amount to an arrest constitutionally, and even a mere detention may, of course, be a "forcible" one (*Adams v. Williams* (1972) 407 U.S. 143, 146; *People v. Johnson* (1991) 231 Cal.App.3d 1, 13). Thus, "[d]espite the express language of the statute, the test is not whether or not there is a physical restraint of the suspect, but whether the 'particular governmental invasion of a citizen's personal security' was reasonable 'in all the circumstances.'" (*People v. Rivera, supra,* 8 Cal.App.4th at p. 1008, quoting *Terry v. Ohio* (1968) 392 U.S. 1, 19.) Police are *not* required to use, as defendants insist, the "least intrusive means" to verify or dispel their suspicions. (*United States v. Sokolow* (1989) 490 U.S. 1, 10-11.)

Nor does it matter that Deputy McCollister characterized his actions at one point as "a felony car stop"; just one page earlier in the transcript he called it "a traffic enforcement stop." But even if by "felony car stop" he meant to betray some intention to arrest

as opposed to just detain, this would not matter. We test justification for a stop or arrest objectively, without regard for the officer's subjective intentions except to the extent they are conveyed to the one confronted. (*Michigan v. Chesternut* (1988) 486 U.S. 567, 575, fn. 7; *People v. Lloyd* (1992) 4 Cal.App.4th 724, 733; see cases discussed in *People v. Woods, supra,* 21 Cal.4th at pp. 678-680.)

We proceed then to the key question whether the facts, viewed favorably to the ruling, allow calling the encounter, at least initially, a forcible stop rather than an arrest. "When are facts known to a police officer constitutionally sufficient to justify a forcible stop? On a number of occasions since its landmark decision in *Terry v. Ohio, supra,* 392 U.S. 1, the high court has reiterated that a police officer's seizure of a person need not in all cases be justified by probable cause to arrest for a crime. [Citation.] Probable cause to arrest exists when the facts and circumstances known to the arresting officer "'warrant a [person] of reasonable caution in the belief that' an offense has been or is being committed [by the person to be arrested].'" [Citations.] By contrast, the temporary detention of a person for the purpose of investigating possible criminal activity may, because it is less intrusive than an arrest, be based on 'some objective manifestation' that criminal activity is afoot and that the person to be stopped is engaged in that activity. [Citations.]" (*People v. Souza* (1994) 9 Cal.4th 224, 230.)

Assuming for the moment that reasonable suspicion rendered the stop lawful, did McCollister's actions in ordering the occupants out at gunpoint and "pron[ing]-them out" on the shoulder of the road convert the encounter into a de facto arrest? In other words, was that action unreasonable in the circumstances? We hold it was not. "[I]nvestigative detentions involving suspects in vehicles are especially fraught with danger to police officers." (*Michigan v. Long* (1983) 463 U.S. 1032, 1047.) For that reason, an officer who lawfully stops a car may, as a matter of course, order out the driver (*Pennsylvania v. Mimms* (1977) 434 U.S. 106, 111, fn. 6) and any passengers (*Maryland v. Wilson* (1997) 519 U.S. 408, 414-415). The only question then is whether the *manner* in which this was done in this case was unreasonable. The record shows it was not. This detention was for suspected operation of a methamphetamine lab and, as has been widely acknowledged,

not Actual operation

15

"'In the narcotics business, "firearms are as much 'tools of the trade' as are most com-
monly recognized articles of narcotic paraphernalia"'" (*People v. Thurman* (1989) 209
Cal.App.3d 817, 822). The risk was amplified because McCollister could not see who
was inside the van and had a report that there were several suspects. "[D]anger to an
officer from a traffic stop is likely to be greater when there are passengers in addition to
the driver in the stopped car" (*Maryland v. Wilson*, *supra*, 519 U.S. at p. 414), and the
added danger is, of course, greater when detainees are suspected of drug manufacturing.
It was nighttime, on a seldom traveled stretch of highway in a rural area, and there were
two officers versus who-knows-how-many detainees. The van was also being followed
by other officers and had just made a U-turn as a possible counter-surveillance measure.
It was not unreasonable to remain behind the patrol car doors and order everyone out at
gunpoint. The "pron[ing] them out" action is unclear on the record. Defendants were
surely ordered to lie down on the ground, but it does not appear—on the suppression
hearing record anyway—whether they were frisked and thus whether the risk of danger
from weapons was allayed. Also unclear from the hearing record is whether defendants
were immediately handcuffed. We will presume in support of the ruling that they were
not, at least until Agent Cox and his partner arrived a "few" minutes later. Given that the
process of ordering defendants out one by one and "pron[ing] them out" must have taken
much of those "few" minutes, we cannot say on this record that the detention was unduly
prolonged. Defendants' references to evidence from the *trial* is improper. No de facto
arrest occurred initially. (Cf. *People v. Glaser*, *supra*, 11 Cal.4th at p. 366; *People v.
Samples* (1996) 48 Cal.App.4th 1197, 1206; see cases discussed in *People v. Soun* (1995)
34 Cal.App.4th 1499, 1517.)

Returning to justification for the stop, we hold that reasonable suspicion appears.
Starting with the tips, the federal Supreme Court has recently observed in the reasonable-
suspicion context that an "unknown" informant seldom demonstrates his or her basis of
knowledge or veracity, whereas a known informant's "reputation can be assessed and
[she] can be held responsible if her allegations turn out to be fabricated . . . ." (*Florida v.
J.L.* (2000) 5__ U.S. ___, ___ [120 S.Ct. 1375, 1378].) Here there were two tips involv-

16

ing three informants, all of whom were known to the officers, and the officers did make some assessment of their bases of knowledge, although this could not be specified due to the risk of divulging identities. Also, the second caller had no known criminal history and was a citizen informant who was presumptively reliable. (*People v. Ramey* (1976) 16 Cal.3d 263, 268-269 [probable cause]; *People v. Hernandez* (1988) 47 Cal.3d 315, 343 [same].) Moreover, these informants corroborated one another, over a span of at least three months (Oct. 1997 through Jan. 1998). While the times are not specified in testimony, McCollister had contacted one of the informants several times in the course of the investigation. Defendants call the information fatally stale since the raid did not occur until mid-April. However, the tips revealed an *ongoing* criminal enterprise at the cabin, something corroborated by information that several people from outside the area were involved and by the fact that Casey had remained the tenant throughout. This continuity saved the information from being too stale. (*People v. Wilson* (1986) 182 Cal.App.3d 742, 754-755 [methamphetamine lab operated six months while defendant remained in possession of property]; *People v. Mikesell* (1996) 46 Cal.App.4th 1711, 1718 [information of drug involvement, some going back two to four years, not fatally stale].) Also, less verification of a tip is needed to support a detention than the issuance of a warrant. (*Adams v. Williams, supra*, 407 U.S. at p. 147.)

On top of the tips, the officers had information that several people were involved in a lab that night, April 15th, at the Casey cabin. Late that night they found a van parked at the locked second gate to the cabin and learned that it was registered to a rental agency in Fresno, consistent with their information that Mexicans from out of the area (including Fresno) were involved. Cox associated the rental vehicle with drug lab operations, knew the cabin was ideal for such an operation and knew that driving late at night and early in the morning further indicated illicit drug activity, as did having several people, as needed for the final stage of methamphetamine manufacture. His suspicions were confirmed and heightened when the van, together with a second car, left the Casey driveway at 2:45 a.m. and the van, which other officers were tailing, made a U-turn for no apparent reason, consistent with a counter-surveillance maneuver. Together, all the circumstances provided

17

reasonable suspicion, which "is considerably less than proof of wrongdoing by a prepon-derance of the evidence" (*United States v. Sokolow, supra,* 490 U.S. at p. 7).

Assuming for sake of argument that the handcuffing of defendants upon Cox's arrival constituted a full arrest (but see *In re Carlos M.* (1990) 220 Cal.App.3d 372, 385, and *People v. Bowen* (1987) 195 Cal.App.3d 269, 274 [no arrest despite handcuffs]), we hold that the officers had probable cause by then. "Cause to arrest exists when the facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the person arrested is guilty of a crime." (*People v. Price* (1991) 1 Cal.4th 324, 410.) In addition to the facts just recited, the officers had made plain view observations (*People v. Rogers* (1978) 21 Cal.3d 542, 549; *People v. Bishop* (1993) 14 Cal.App.4th 203, 211, fn. 4) that defendants matched the description provided by the informants, and that Ayon wore pants stained and burned as if from methamphetamine production. Officer Cox also saw that two people were among the three persons specifically named in one of the tips. Given a proper arrest, the officers could make a search incident thereto (*People v. Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 812-813), although this may not have happened. Suppression was properly denied.

## II. *Weight Enhancement*

Defendants challenge the sufficiency of the evidence to support their count-1 enhancements for manufacturing a methamphetamine-containing substance exceeding 10 pounds. The pertinent statutory language is in section 11379.8 of the Health and Safety Code (all unspecified references are to that code), which provides: "(a) Any person con-victed of a violation of subdivision (a) of Section 11379.6, or of a conspiracy to violate subdivision (a) of Section 11379.6, with respect to any substance containing a controlled substance which is specified in . . . paragraph (1) or (2) of subdivision (d) . . . of Section 11055 shall receive an additional term as follows: [¶] . . . [¶] (3) Where the substance exceeds 25 gallons of liquid by volume or 10 pounds of solid substance by weight, the person shall receive an additional term of 10 years."

Our review standards are settled. "[T]he test of whether evidence is sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to

the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] In making this assessment the court looks to the whole record, not just the evidence favorable to the respondent to determine if the evidence supporting the verdict is substantial in light of other facts. [Citations.]

"The standard of appellate review is the same when the evidence of guilt is primarily circumstantial. 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.'"" [Citations.]" (*People v. Holt* (1997) 15 Cal.4th 619, 667-668.)

Defendants dispute not just the strength of the evidence but, further, what it was that had to be proved, raising, in essence, questions of statutory interpretation. Thus in arguing that the requisite 10 pounds is not supported, they attack (1) whether 10 pounds of the finished drug was *actually existing*; (2) *when* the 10 pounds was produced; and (3) whether the jury improperly relied on substances in the *waste sludge* to reach its finding that over 10 pounds was made. We examine those legal questions first.

**Existing substance.** Only two ounces of finished drug (Casey's part payment) were actually seized, and the prosecutor suggested in jury argument that Pepe, alerted to the police raid as the van left just ahead of him, had "escaped in the Cadillac" with the rest. Defendants claim insufficient evidence that over 10 pounds of methamphetamine *actually existed*, and they premise this in part on *People v. Lopez* (1993) 20 Cal.App.4th 897 (*Lopez*), and *Valenzuela v. Superior* Court (1995) 33 Cal.App.4th 1445 (*Valenzuela*).

We find their authorities distinguishable. Case law holds, first, that a conviction for manufacturing a controlled substance as charged here in count 1 (§ 11379.6) does not require evidence of a finished product. The gravamen of the offense is the *manufacturing* of the drug and includes, in ordinary understanding, the processes leading to the finished

19

product, even where there is no evidence that the end-product stage was reached. Thus, "[a]lthough . . . the presence of the end product at a PCP lab is sufficient circumstantial evidence that 'the manufacturing process ha[s]taken place' [citation], even though one of the intermediate ingredients was no longer present, the presence of the end product is not necessary to establish that the PCP manufacturing process was taking place." (*People v. Jackson* (1990) 218 Cal.App.3d 1493, 1504-1505.) Similarly, evidence of manufacturing methamphetamine is sufficient even where, for example, a lab is found boxed in a storage locker, as if between production steps, and without all of the ingredients present (*People v. Lancellotti* (1993) 19 Cal.App.4th 809, 811-813), or where abundant circumstantial evidence shows manufacturing yet the final stage of production had not been reached (*People v. Heath* (1998) 66 Cal.App.4th 697, 704-705).

This idea is mirrored in *People v. Good* (1990) 217 Cal.App.3d 1533 (*Good*), where the same enhancement language at issue here—a "substance exceed[ing] three gallons of liquid by volume or one pound of solid substances by weight" (§ 11379.8, subd. (a)(1))—was held met without evidence of any finished product *and* where testimony was that the requisite enhancement amount could be reached only by *aggregating* the liquid and solid measurements based on precursor materials seized. Said the court: "Under defendant's reasoning, the timing of the seizure would become all important. The authorities would be obliged to intervene either at the precise moment the manufacturing was completed but before the material was processed from a liquid to a solid, or only after the processing was completed. It appears clear the Legislature enacted the provision as a means of combating the increasing problems of drug dealing in California. A construction which would require the police to time their entry by reference to the suspect's production clock would be an unreasonable construction of the statute." (*Good, supra,* 217 Cal.App.3d at p. 1537.)

Defendants' insistence on a need for 10 pounds of finished product flows from *Lopez, supra,* 20 Cal.App.4th 897, where a weight enhancement under section 11370.4 for a conspiracy-to-sell count was stricken. The conspiracy involved a sting in which the defendant bought from police a large quantity of a precursor chemical (ephedrine) but

where nothing more, beyond talk of making methamphetamine, was done. (*Id.* at p. 900.)
The court's core reasoning was this: "The enhancement applies if the 'substance *exceeds*
three pounds by weight.' Implicit in this statement, in its use of the present tense of the
word 'exceed,' is a presently existing substance (methamphetamine, amphetamine or
PCP) which can be weighed and which weighs more than three pounds. The statute does
not state . . . that the enhancement applies if a person, convicted of a conspiracy to sell
methamphetamine, *planned* to make more than three pounds of the substance; the
enhancement applies when there is conviction of conspiracy to sell methamphetamine
and the methamphetamine (actually existing) exceeds three pounds in weight." (*Id.* at
p. 902, fn. omitted.) Oddly, the case does not discuss *Good*, *supra*, which we have noted
allowed proof of weight from not-yet-processed chemicals. Whatever the effect of that
oversight, however, we find *Lopez* distinguishable because there, no finished drug *at all*
had been produced. Here, where the methamphetamine was clearly produced and the
only problem is a failure to seize all of it, *Good*'s rationale directly applies—that to read
the statute as requiring perfect timing on the part of the police would defeat the purpose
of the statute and be unreasonable. (*Good*, *supra*, 217 Cal.App.3d at p. 1537.) Stated
differently, the problem here is not that none of the drug "actually existed." It did exist,
and the only question is whether the amount may be proved by circumstantial evidence.
We hold that it may. This is also consistent with defendants' other authority, which in
another conspiracy case followed *Lopez* (and missed *Good*) to strike a weight enhance-
ment. (*Valenzuela*, *supra*, 33 Cal.App.4th at pp. 1449-1455.) The case cautioned that
this "does not mean that sentence enhancements are necessarily limited to the weight of
what the police recover. We have used the term 'seized' simply to indicate that under
section 11370.4, subdivision (a), a substance must have physically existed at some point
in time." (*Id.* at p. 1455.) Here, by the direct testimony of Casey, who saw a loaf-size
amount packaged into one-pound pieces and who turned over his own two-ounce share to
police, the whole amount did exist physically.

**When produced.** Defendants protest a lack of proof that they were present during
production of the full amount of the drug and urge that they cannot be responsible for the

21

enhancing amount. This is especially stressed by Aguirre and Martinez, who were shown to have been present on the Casey property only from 10 a.m. on April 15th, the last day of the production, until the enterprise ceased 17 hours later. Those defendants express concern that they might have been held responsible for the fruits of four prior "cooks" that year in which they did not participate. The latter concern is somewhat perplexing. Defendants concede they were charged only with the most recent "cook," and they cite no misinstruction that would have allowed jurors to take into account methamphetamine produced in prior operations. To the extent that they complain about the prosecutor's arguments about using the sludge to gauge the amount of methamphetamine produced, we will reject that point in another subpart of this opinion (*post*).

Defendants do cite again to the *Lopez* case, here for the proposition that if it is not enough to conspire to produce 10 pounds without actually producing that amount (*Lopez*, *supra*, 20 Cal.App.4th at pp. 902-903), then section 11379.8 "must only be used against a person for what he actually produced." We see no such limitation in the statute. The Legislature was surely aware that liability may be predicated on participation far short of a full two- or three-day "cook." Jurors here were instructed, for example, that one avenue to culpability was aiding and abetting, and the Legislature must have anticipated this and known that aiding and abetting may occur anytime during the commission of an offense (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039) and by intentionally contributing to the accomplishment of the crime even though not personally engaging in all of its elements (*People v. Morante* (1999) 20 Cal.4th 403, 433). The Legislature did specially provide that where liability is based on *conspiracy*, for which personal involvement in the crime's commission is not even required (*id.* at p. 417), the jury must find that the defendant "was substantially involved in the direction or supervision of, or in a significant portion of the financing of, the underlying offense." (§ 11379.8, subd. (e).) The Legislature declined to so limit the statute's application for cases of manufacturing, as opposed to conspiracy to manufacture. The enhancement allegation in this case was attached to the manufacturing in count 1, not the conspiracy in count 2. The statute also makes no special provision for aiding and abetting.

22

Also, this is not a troubling case of late participation, even if defendants tried to so convince the jury. Three of them testified that they only arrived at the cabin that evening, which dovetailed into the sometimes hazy testimony of Casey, who specifically recalled seeing them only that night. We know, however, from the jury's findings of overt acts on the conspiracy count that jurors rejected this. Rather, they found that each defendant had "traveled to the manufacturing site" and "obtained chemicals," the latter of which finding was inconsistent with any defendant's testimony and consistent with Alvarez's testimony that he dropped them all off at the cabin at 10 o'clock that morning. No defendant has mounted a challenge to either of the overt-act findings. Substantial evidence supports an implicit finding that they were at the cabin for the full day on which the loaf-size mass of methamphetamine (seen that evening by Casey) was finished. They cannot credibly argue, on this record, that their participation throughout that day (Casey said they were working when he left that morning) was insignificant.

Finally, we hold it immaterial that part of the loaf might have been processed the day before two of the four defendants were on the premises. "The quantity enhancement is concerned with the total amount of drugs involved, not the varied crimes for which the defendant may be held culpable." (*People v. Estrada* (1995) 39 Cal.App.4th 1235, 1240 [construing § 11370.4].) And as an evidentiary matter, it appears unlikely that any of the drug was actually "cooked" on days prior to April 15th. Casey testified to seeing the ingredient ephedrine being extracted from pills on a prior day, but expert testimony from Agent Diaz was that the cooking process could take up to 14 hours and, for an operation this size, would have taken between four and eight hours. That is entirely consistent with the time defendants were all at the cabin, on the 15th.

**Sludge waste.** The arguments about the sludge waste in the pit outside the cabin require some backdrop. The Supreme Court has held, as to enhancements for substances exceeding "'10 pounds by weight'" under former section 11370, that the weight is determined not by reference to a pure, uncut form of the drug, but by "the total weight of any compound or mixture containing a drug enumerated by section 11370.4." (*People v. Pieters* (1991) 52 Cal.3d 894, 897 & fn. 1.) This principle has been extended to the 10-

pound weight enhancement at issue here. (*People v. Burgio* (1993) 16 Cal.App.4th 769, 774-777.) Also, as will be explain more fully in part IV of this opinion (*post*), there is no requirement that the prosecution prove that a substance has a narcotic effect—i.e., a stimulant effect on the central nervous system—so long as the substance is in a form and quantity that can be used. (*People v. Rubacalba* (1993) 6 Cal.4th 62, 65-66.)

Defendants argue in various ways that the jury improperly relied on the sludge in the waste pit to conclude that over 10 pounds of methamphetamine had been produced. First, they infer from testimony about prior "cooks" at the cabin that the pit could have contained some waste from those productions and thus should not have been used to calculate the amount of methamphetamine produced by them. Second, they argue that the waste was toxic and thus not in a form that could be used. Third, and to underscore possible jury reliance, they note that the prosecutor suggested in argument two ways to determine quantity—either from *the 127 pounds of sludge* containing methamphetamine or from the size of equipment, volume of chemicals, and testimony from Casey about the loaf-size product. Fourth, and to further underscore possible reliance, they point to a note from the jury asking, during deliberations, for explication of the word "solid" in the operative language, "10 pounds of solid substance by weight" (§ 11379.8, subd. (a)(3)), as given to them in CALJIC No. 17.21. (The court simply responded, in writing, that "any words not specifically defined should be given their common, ordinary meaning.")

We readily accept, from the inquiry about a "solid" substance, that jurors probably did have in mind the sludge; one witness, for example, had described it as being "of a pasty, wet nature." However, no claim is made that jurors were not, in common experience, equipped to decide whether the sludge was "solid" or instead "liquid," the implicit alternative. This was a conscientious jury, as its notes and read-back requests show. If jurors had a reasonable doubt about the "solid" nature of the waste, they presumably followed general instructions (*People v. Delgado* (1993) 5 Cal.4th 312, 331) and did not rely on it. No defendant argues that any special definition was needed.

If defendants mean to complain that the prosecutor, by inviting reliance on the sludge, misapplied the law or misused the evidence, our answer is that no objection was

raised to this, and the point is thus waived for appeal. (*People v. Gionis, supra*, 9 Cal.4th at p. 1214, fn. 11; *People v. Mayfield* (1993) 5 Cal.4th 142, 178.) In the context of a substantial evidence claim, which this is, we are also required to presume that jurors faced with alternative theories, one supported by the evidence and the other not, properly relied on the supported theory. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1128-1130.) "[T]he prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.) Also, because we will find the alternative basis of evidence well supported by direct testimony from Casey and from witnesses who estimated the size of the product by the evidence left behind, it is highly unlikely that the jury found it necessary to rely on any of the methamphetamine contained in the sludge waste.

Next, defendants' point that the sludge was toxic and thus not in a usable form yields nothing. There was overwhelming evidence that a usable form of methamphetamine was produced. Casey saw a large loaf of it and turned over two ounces he had been paid for use of the cabin. A need to show usable quantity exists only when the substance "simply cannot be used, such as when it is a blackened residue or a useless trace. It does not extend to a substance containing contraband, even if not pure, if the substance is in a form and quantity that can be used." (*People v. Rubacalba, supra*, 6 Cal.4th at p. 66.) We are cited no authority, and know of none, that a weight enhancement requires that the *entire* weight be in a useable form. Such a construction of section 11379.8 would be unreasonable and defeat its purpose of punishing large drug operators. (*Good, supra*, 217 Cal.App.3d at pp. 1537-1538.) Imagine, for example, a case where 15 pounds of meth-amphetamine had been produced, by all accounts and circumstances, but as police raided the lab, a suspect flushed 14 pounds into a septic tank, polluting them beyond use. The "usable form" rule should not prevent application of an enhancement in such a situation. Thus, in the unlikely event any juror here found a need to rely on any methamphetamine contained in the sludge, the statute was still satisfied.

Defendants' concern about jurors relying on sludge from prior "cooks" has no place on this appeal. It was an argument for the jury and was in fact suggested below by

Aguirre's counsel, who called Casey a liar and said it was "just fantastic" that over 100 pounds could have come from a single cook. The jury had ample means to resolve this and, we infer in support of the verdict, did so in favor of the prosecution. Casey said, in essence, that the pit had not been there before the last "cook"; otherwise he would have seen it. He also testified that waste from prior cooks had *not* been dumped there. Jurors could reasonably reject the idea of him lying. He had been charged and pled guilty and, at trial, confessed personal involvement in four prior "cooks" at the cabin. He had little or nothing to fear by admitting that any of the sludge had been there before. Also, the amount of sludge was not necessarily "fantastic" for one cook, as counsel argued. While some testimony suggested that the amount could have been from more than one cook, Special Agent Baker testified that the sludge waste would occur in a conservative ratio of seven pounds for every pound of methamphetamine produced in the lab. Given that 126 pounds of waste were recovered, this worked out to 18 pounds of methamphetamine, which was consistent with estimates based on other circumstances. Defendants complain that Baker's estimate assumed the sludge was dry, whereas it was found wet. They say that applying his formula "[o]ver objection," and without scientific foundation, violated principles in *People v. Kelly* (1976) 17 Cal.3d 24, and *People v. Leahy* (1994) 8 Cal.4th 587. However, no objection *on this ground* was raised below, and the issue is waived. (*People v. Farmer* (1989) 47 Cal.3d 888, 913.) An unelaborated objection below "on the grounds of hearsay and foundation" was understandably taken by the prosecutor and the judge as an objection to the expert relying on hearsay opinion, and was overruled on that basis. No *Kelly/Leahy* objection to lack of scientific foundation was raised.

   **Ten pounds.** The remaining question, then, is whether the record contains substantial evidence that over 10 pounds of methamphetamine-containing substance (apart from sludge) was produced. Bearing in mind that circumstantial evidence is sufficient proof (e.g., *People v. Heath*, *supra*, 66 Cal.App.4th 697, 706 [equipment and supplies show manufacturing]), the overwhelming answer here is *yes*. Defendants cite their due process right to have guilt proved beyond a reasonable doubt. Yet "[t]o say that an infer- ence is permissible under certain circumstances is, of course, to say that those circum-

26

stances afford a rational basis for the inference, and inferring one fact from another is consistent with due process if there is a rational connection between the two." (*People v. McFarland* (1962) 58 Cal.2d 748, 755-756.)

The inferences in this case that the weight exceeded 10 pounds were cumulative, and only a few need be mentioned. As already noted, the seven-to-one ratio of waste to product supported the existence of about 18 pounds (and without using the sludge itself as any part of that 10 pounds). More directly, Casey, who as a confessed daily user of the drug was clearly familiar with it, saw a loaf of finished product—"[r]oughly what would fit in a bread bag"—and saw it divided into "one-pound increments" and wrapped. It is true that jurors were never given testimony to correlate the indicated size with a particular weight, but it was surely within the ken of average jurors to make a rough estimate given their life experiences with solid objects that size. Also, the reporter's transcript states that Casey indicated the size with his hands, saying "about like that and about like a loaf of bread." To the extent that "bread bag" or "loaf of bread" are unclear indications of size, this works against defendants on substantial evidence review, for the jury received a physical demonstration which, without a more precise record explanation, cannot be second-guessed on appeal. "What the trier of fact observes is itself evidence which may be used alone or with other evidence to support the judgment. [Citations.] When what the trier of fact observed has not been made a part of the transcript on appeal, a reviewing court must assume that the evidence acquired by such a viewing is sufficient to sustain the finding or judgment in question. [Citation.] Furthermore, [even] when there is a conflict between such evidence and other evidence, it is presumed that the trier of fact resolved the conflict by accepting the demonstrative evidence as being more credible, and this determination is binding on a reviewing court." (*People v. Buttles* (1990) 223 Cal.App.3d 1631, 1639-1640.)

We cannot say that a "loaf" of solid methamphetamine the size of a "bread bag" could not weigh over 10 pounds. Casey did not testify to his own estimate of the weight, but Deputy McCollister related, without objection, Casey's hearsay statement that Casey told him that the drug was "like a size of the loaf of bread [*sic*], maybe twenty pounds."

27

Police, of course, seized the two ounces Casey said he had been paid. Two glass flasks and heating mantels found covered in branches and debris about 250 yards from the cabin were, by inference, those Tony and Alvarez had carried off at Casey's urging just before the Task Force came. Casey had arrived home to see the two flasks washed and drying against his fence. Each was a 22-liter "triple neck reaction wrestler flask" which, according to Agent Baker, is typically used to produce from 6 to 14 pounds of methamphetamine. Given the total chemicals and by-products found, Baker opined that the use had been at the high end of the range: "[W]hy would you just make six and then turn around and fill the vat can up and start making more? You're gonna max 'em out as much as you can as you're doing your cook." Department of Justice criminalist Matthew Kirsten, who in his work visited about five clandestine drug labs each year, testified similarly that each flask "[h]ypothetically" produced, on average from his experience, somewhere around 10 pounds.

Also, this was a large-scale and ongoing operation. According to BNE Agent Joseph Diaz, who had extensive training and experience in methamphetamine production, a "torpedo" cylinder of hydrogen chloride gas found at the property was of a size large enough "to probably cook hundreds of pounds of methamphetamine, maybe three or four hundred pounds," and Casey testified that there had been several successive cooks at the cabin. Diaz testified that 200 pounds of ice (Alavarez said he bought ten 20-pound bags) would be enough to produce 40 to 50 pounds of the drug, and officers on the scene on the morning of April 16th found only two bags left.

Without detailing the supporting evidence about other chemicals and equipment, there is clearly substantial evidence to support a weight of over 10 pounds. The jury also must have considered the large number of people involved on the last day of this cook. Testimony by Agent Baker was that large labor forces were used so that a large quantity could be produced in a relatively short period of time.

### III. *Leg Restraints*

Defendants claim constitutional error in being required, for security reasons, to wear leg restraints during the trial. Together with their fifth codefendant below (Efren

28

Mora had not yet pled no contest), they objected to the use of restraints and joined in a motion heard and decided against them just before jury selection. We will find an abuse of discretion but no cause to reverse.

**The hearings.** The issue was properly framed as whether there was a "manifest need" for restraints. Evidence at a hearing held on July 13, 1998, consisted of testimony from Sergeant Dana Burr of the Court Services Division of the sheriff's department, from Aguirre, and through offers of proof by two defense counsel. The type of restraint, Burr explained, was a leg brace worn under the clothing. It would not be seen by the jury but was made of vinyl, steel and some cloth and ran from just above the knee to the ankle. It would slow the person down and "actually lock" at the knee should he try to run. It made "a small clicking noise if it's not lubricated" and, as far as Burr knew, had never been noticed by jurors in trials where used. Wearers had complained only that "sometimes they're too tight," in which case "they're loosened up." No chafing had been reported.

Aguirre, on the other hand, testified to some discomfort. The brace he had on was "[a] little bit uncomfortable" because "it kind of rubs against my leg," although it did not grow "more uncomfortable" throughout the day. He said he felt "really bad"—as if "tied up like an animal." His and other counsel explored the possibility of alternatives to the brace, like increased staffing (see *People v. Ayala* (2000) 23 Cal.4th 225, 253), and made offers of proof that in other trials in that county their clients had not been restrained. One attorney did confirm anecdotally that the braces are *not* noticeable: "We had a hearing in the middle of jury selection, and the leg brace was removed when I discovered that it was part of . . . what he was wearing. I didn't realize . . . was wearing it until he complained of the chafing and the clicking noise." Judge Cissna also recalled once being unaware of a leg brace until it was mentioned midtrial. Counsel for Martinez had said: "They hurt their legs. They bind. They click. The jury hears them. It tells the jury the minute they hear it click, these men are shackled. There's no showing of necessity. My client in particular has always been a gentleman in the courtroom. He's been a gentleman when I've seen him. The court knows [from the suppression hearing] when these young men were arrested and taken out of the car at gunpoint they did nothing but comply with authority."

29

Sergeant Burr knew of no misconduct by any of these defendants—no disruptive behavior in court, attempted escapes from custody, or past assaultive conduct. Nor had any defendant resisted when arrested or transported since then. Aguirre, seconded by his counsel, testified that he was not a flight risk, and other defense counsel said all of the defendants had been cooperative and comported themselves so as to make restraints unnecessary. The judge agreed, saying that in "numerous" appearances so far, defendants had not "done anything in the presence of myself that would be inappropriate in the courtroom. I think Mr. Cater said last week that each of the defendants have been perfect gentlemen. That is true. They have to date in court."

Nevertheless, the judge was persuaded in the end that restraints were needed due to a general lack of security in the courtroom, the gravity of the charges, and the logistics of jointly trying five defendants who needed interpreters. Drawing on testimony by Burr about security and understaffing, and speaking to some alternatives suggested by defense counsel, Judge Cissna ruled: " . . . I do make a finding that there is a manifest necessity for additional security. I base that primarily upon the facts that there are five defendants, the seriousness of the charges, the lengthy potential prison sentences, the fact we've been experimenting with various seating arrangements -- we now have two of the defendants sitting in the audience section of the courtroom with attorneys and interpreters, one on one side of the aisle, one on the other side of the aisle. We have two defendants seated at counsel table. We have one defendant seated behind the counsel table with his attorney and interpreter in front of the bar. Nothing that has been presented would indicate that the use of the leg restraints would in anyway interfere with the defense of this matter on behalf of any of the defendants. There appears to be no prejudice whatsoever to the defendants in terms of the jury. I think that putting up a temporary metal detector outside the courtroom would be prejudicial. I think that adding additional security in the terms of persons to the courtroom would be prejudicial, even if some of them were in plainclothes. It would be pretty obvious over a six-week trial as they're seated there. And I'd also note that we're only going to be in session half days, from eight thirty to twelve. So the uncomfortableness wouldn't be extreme. In fact, the person that testified, Mr. Aguirre,

30

says it doesn't get more uncomfortable during the times he's wearing it. He says it's only a little bit uncomfortable. I think the need outweighs that. So that's my finding as to that issue." The court had also stated earlier: "The leg braces are not visible to anyone. And while -- when a person is wearing one and is walking, there may be some very faint noise in the form of a clicking type sound, or it may appear that they're walking a little bit oddly. None of these defendants will be walking in the presence of the jury. Or if that becomes the issue at some point such as if they were to testify, either it could be removed during that period or they could be seated in the witness chair or some sort of arrangements could be made so they would not be walking in the presence of the jury."

Burr had testified that the use of restraints was an unwritten policy in place "for the last couple of years," in "[e]very trial," to further a preferred officer/defendant ratio of two to one, and Judge Cissna had explained: "I asked Sergeant Burr to appear because I was informed that he was the one that had made the decision or policy on behalf of the department that these defendants should wear leg braces. He wasn't subpoenaed." When one defense attorney suggested that the court was delegating its decision to the marshall's office, Judge Cissna retorted: "Absolutely has not occurred. I can assure you of that. I'm making the decision. I'm asking for input just as I am from all of you. So I'm not delegating the authority. I'm making that decision. That's why we're having a hearing."

Testimony, plus comments from the judge, also reveal that the courtroom had no "perimeter security" or officers in the hallways, and a call for overtime volunteers for this case had produced only one extra officer. This county did not have available to it the electronic "react belt" used in some counties, and such a device required two officers to operate in any event. The judge was concerned that the presence of extra security staff would prejudice the defendants in the jury's eyes more than the leg braces would, and in this exchange with one defense attorney he drew a distinction between the braces and shackling: "This isn't shackling. You can't confuse the cases that talk about shackling with what we have here. I can assure you that if we're not going to have leg restraints when we have a five-defendant case, we're going to have additional bailiffs if I have to order them to be here. Don't you agree that having five officers in the court would be

31

more prejudicial to the defendants than wearing the leg restraints?" Defense counsel, whose comments the judge accepted on behalf of all the defendants, replied, "I don't," and insisted that no manifest need for the restraints had been shown.

The issue arose again two days later, during jury selection on July 15. Out of the jury's presence, counsel for Ayon related that Ayon reported feeling pain from a lesion on his leg where the brace flexed. Counsel for Martinez voiced a similar complaint from Martinez about a sore spot on an ankle that hurt when he walked in the brace. The judge paused the proceedings to allow medical staff from the jail to attend to Ayon, but the result left him obviously skeptical. The wound had been wrapped but, the judge noted, Ayon had "refused" to have a brace placed on the other leg instead and had "indicated that, no, he was gonna wear the leg brace on the leg that had the sore. And he also apparently indicated to one of the security staff, he bet that he wouldn't have to wear a leg brace very long. It appears to me there might be some game playing here. The Court isn't going to allow that. So in the future . . . each of the defendants will wear the leg brace on the leg that the jail staff directs that they're to wear it on. They're not going to wear it on a leg that has a sore and then complain about it." The judge also directed that the braces would be applied and removed in a secure room near the courtroom to take care of any chafing problem during travel to and from the jail. The medical staff member examining Ayon had said the lesion was "an old lesion."

The subject arose one last time on July 24, after jury selection and after Mora had pled no contest. The four remaining defendants renewed their objection, reiterating their position that no manifest need existed. All four were in handcuffs and leg irons at that point, and Judge Cissna explained that he was giving defendants a break from the leg braces since the proceedings were not in front of the jury. The judge allowed the cuffs to be removed, gave each defendant the option of using the leg irons or a leg brace, and ordered a second bailiff to be present.

**Analysis.** "'[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a *manifest need for such restraints*. [Citation.]' [Citations.] Such a '"[m]anifest need" arises only upon a

32

showing of unruliness, an announced intention to escape, or "[e]vidence of any noncon-
forming conduct or planned nonconforming conduct which disrupts or would disrupt the
judicial process if unrestrained . . . .'" [Citation.] 'Moreover, "[t]he showing of noncon-
forming behavior . . . must appear as a matter of record . . . . The imposition of physical
restraints in the absence of a record showing of violence or a threat of violence or other
nonconforming conduct will be deemed to constitute an abuse of discretion."'
[Citations.] A court's decision to place a defendant in physical restraints will not be
overturned on appeal unless there is a 'showing of a manifest abuse of discretion.'
[Citation.]

"This emphasis that a showing exist on the record of 'manifest need' for shackles
presupposes that it is the trial court, not law enforcement personnel, that must make the
decision an accused be physically restrained in the courtroom.[Fn.] A trial court abuses its
discretion if it abdicates this decisionmaking responsibility to security personnel or law
enforcement. [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 841, quoting in part
from *People v. Duran* (1976) 16 Cal.3d 282, and *People v. Cox* (1991) 53 Cal.3d 618.)

Defendants argue that Judge Cissna abused his discretion, first, by delegating his
responsibility to Sergeant Burr, and second, by ordering restraints without a true showing
of manifest need. The first point cannot be squared with the judge's actions and express
statements to the contrary, that he was using Burr's testimony only as input toward the
*court's* decision. (Cf. *People v. Jacla* (1978) 77 Cal.App.3d 878, 885; *People v. Jenkins*
(2000) 22 Cal.4th 990, 999 [despite consulting with bailiff, court's "extended comments
on the record indicate that it did not abrogate its authority over the matter of security"].)

The second point, however, has merit. In stressing the staffing needs of the court,
the judge seems to have overlooked, entirely, settled law that a "'"[m]anifest need" arises
*only* upon a showing of unruliness, an announced intention to escape, or "[e]vidence of
any nonconforming conduct or planned nonconforming conduct which disrupts or would
disrupt the judicial process if unrestrained . . . ."' [Citation.]" (*People v. Hill, supra*, 17
Cal.4th at p. 841, italics added.) By the judge's own reckoning, there was *no evidence* of
such propensities by any of these four defendants, just concern that if there had been such

33

evidence, the available security measures in the courtroom might be inadequate to control a disruption. There is no point in pondering whether the judge adequately considered less restrictive or intrusive alternatives to the leg braces (*Spain v. Rushen* (9th Cir. 1989) 883 F.2d 712, 721; *People v. Medina* (1995) 11 Cal.4th 694, 731), for without a proper showing of need, no restraint at all was justified. Likewise, the judge's distinction between leg braces and ordinary "shackles" was beside the point, for no restraint at all was justified unless a manifest need was shown.

We appreciate the judge's concerns over courtroom security in general for trials of serious offenses, but those concerns provided no showing that these particular defendants posed a threat of disruptive conduct. If general conditions were enough, then no one in an understaffed or underfunded county might have the right to be tried free of restraints. Our Supreme Court has held it insufficient alone that a defendant is on trial for a capital offense and has a record of violence; there must be a showing of "'violence or nonconforming conduct' while in custody." (*People v. Hawkins* (1995) 10 Cal.4th 920, 944.) Thus a manifest abuse of discretion appears. (See also Pen. Code, § 688 ["[n]o person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge"].)

Prejudice, however, does not appear. As explained by our high court, the paramount fair-trial concern is avoiding "prejudice in the minds of jurors where a defendant appears or testifies in obvious restraints, or where the restraints deter him from taking the stand in his own behalf. We have consistently found any unjustified or unadmonished shackling harmless where there was no evidence it was seen by the jury." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583-584.) As for jury prejudice, "Nothing in the record on appeal clearly establishes that the jury did or could see defendant[s'] restraints." (*Id.* at p. 584; *People v. Coddington* (2000) 23 Cal.4th 529, 651.) First, nothing clearly shows that Judge Cissna ever retreated from these promises: "None of these defendants will be walking in the presence of the jury. Or if that becomes the issue at some point such as if they were to testify, either it could be removed during that period or they could be seated in the witness chair or some sort of arrangements could be made so they would not be

34

walking in the presence of the jury." (Cf. *People v. Coddington, supra,* 23 Cal.4th at p. 651.) Indeed, reading through the points in the transcript where Aguirre, Madueno and Martinez testified shows a pattern of the judge calling a recess as each one finished or began testifying, or having the jury brought in when they were apparently already on the stand. We also cannot know from the record whether anyone even wore the leg braces at those times. And if we could determine that they did wear them when taking or leaving the stand, we could not determine whether any juror ever realized this. There had been some discussion of the devices making a faint clicking sound (if not lubricated, anyway), but nothing affirmatively indicates that they did click. Nor does anything show that the restraints were visible under defendants clothing (all comments were to the contrary) or that defendants did ever walk "oddly" or otherwise give jurors reason to believe they were restrained. (*People v. Majors* (1998) 18 Cal.4th 385, 406 [no prejudice where record failed to establish that any juror actually saw physical restraints].)

As for deterring defendants from testifying, three of these defendants did testify and thus were not deterred (assuming they wore restraints). As for Ayon, who did not testify, nothing shows that a leg brace played any part in his decision (*People v. Tuilaepa, supra,* 4 Cal.4th at p. 584) or that the brace would not have been removed temporarily should it have been a concern to him.

Other fair-trial concerns are that restraints may impair mental state or an ability to cooperate or communicate with counsel (*People v. Hill, supra,* 17 Cal.4th at p. 846), but that does not appear here. Two defendants did say once that the braces rubbed on lesions, but the judge had this attended to and lessened any problem by ordering restraints applied and removed near the courtroom. No further complaints appear on the record. Also, in reviewing a judge's assessment of claimed pain or disruption, we must defer to findings on veracity. (*Spain v. Rushen, supra,* 853 F.2d at pp. 718-719.) Judge Cissna felt there was "some game playing" by the two complaining defendants, and we infer from this a finding (supported), that defendants had exaggerated any discomfort. Lack of record prejudice also answers defendants' further complaint about having to wear restraints in proceedings *outside* the presence of the jury, like at suppression and *Miranda* hearings.

35

Finally, there is no merit to a complaint of prejudice from the judge's failure to instruct, sua sponte, that jurors disregard and draw no inferences from the restraints. Such instruction is proper only "if the defendant's restraints have been viewed by the jury"; "no sua sponte instruction is required if the restraints are not visible . . . ." (*People v. Medina, supra,* 11 Cal.4th at p. 732.) Since the record here does not show that the restraints were visible, any instruction to disregard them, of course, would have been counterproductive.

No prejudice appears from the court's abuse of discretion.

### IV. *Instructions*

**Nonprosecution of others.** The court gave standard CALJIC Instruction No. 2.11.5, which directed that while there had been evidence indicating that a person other than defendants may have been involved in the crimes, there could be many reasons why that person was not tried and, "[t]herefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted." Defendants, relying on the use note and case law cautioning that this instruction should not be used when the other person is a witness for either side in the case (*People v. Marks* (1988) 45 Cal.3d 1335, 1346-1347), claim state and federal due process error, arguing that jurors might have been misled into thinking they could not consider that prosecution witnesses Carlos Alvarez and Don Casey had pled guilty to manufacturing methamphetamine and received lenient dispositions in exchange for testifying.

We reject the claim for three reasons. First, as the People observe, there was testimony about *non*testifying "other persons" involved in the drug scheme ("Pepe," for example) and thus a need for the instruction at least as to those persons; thus the error, if any, was in failing to *limit* the instruction to those participants (*People v. Williams* (1997) 16 Cal.4th 153, 226-227). Our Supreme Court has declared the issue waived on appeal where, as here, the appellant never requested a modification to that effect below. (*People v. Sully* (1991) 53 Cal.3d 1195, 1218.) Thus the first answer is waiver.

Second, as Court of Appeal precedent observes, the predicate for finding error in giving the instruction "is that a *nonprosecuted* participant in the crime has testified. That

36

predicate is unsatisfied . . . where the jury was told that [a testifying witness] had been charged and pleaded guilty . . . ." (*People v. Rankin* (1992) 9 Cal.App.4th 430, 437.) When that occurs, the jury clearly understands that the instruction applies only to non-testifying participants, and there is no error. (*Ibid.*) Here, where both Alvarez and Casey testified before the jury that they had been charged and pled guilty, there was no error.

Third, the Supreme Court has adopted similar reasoning to find no error where, as here, the instruction did properly pertain to nontestifying coparticipants. "'The purpose of the challenged instruction is to discourage the jury from irrelevant speculation about the prosecution's reasons for not jointly prosecuting all those shown by the evidence to have participated in the perpetration of the charged offense, and also to discourage specu-lation about the eventual fates of unjoined perpetrators. [Citation.] When the instruction is given with the full panoply of witness credibility and accomplice instructions, . . . [jurors] will understand that although the separate prosecution or nonprosecution of co-participants, and the reasons therefor, may not be considered on the issue of the charged defendant's guilt, a plea bargain or grant of immunity may be considered as evidence of interest or bias in assessing the credibility of prosecution witnesses. [Citation.] . . . .'" (*People v. Cain* (1995) 10 Cal.4th 1, 35, quoting *People v. Price, supra*, 1 Cal.4th at p. 446; accord *People v. Carrera* (1989) 49 Cal.3d 291, 313, and *People v. Williams, supra*, 16 Cal.4th at p. 227 [finding, in light of other instructions, no prejudice from any error].) Full instructions on witness credibility (CALJIC No. 2.20) and accomplice testi-mony (CALJIC Nos. 3.10, 3.11, 3.12 & 3.18) were given here, and jurors were further told that Alvarez and Casey were accomplices as a matter of law and thus subject to the corroboration requirement (CALJIC No. 3.16). Finally, no argument suggested to the jury that they could not consider the favorable treatment in evaluating the testimony by Alvarez and Casey. (*People v. Carrera, supra*, 49 Cal.3d at pp. 313, fn. 11.)

**Stimulant effect of drug.** Defendants claim error in the court's failure to instruct —on its own motion as a general principle of law—that the methamphetamine as found at the cabin had to have "a stimulant effect on the central nervous system," and they urge a lack of stimulant-effect evidence in the record. Absence of the instruction, they argue,

37

effectively removed or directed a verdict on an element of the enhancement (§ 11379.8) and was prejudicial.

They cite *People v. Leal* (1966) 64 Cal.2d 504 (*Leal*) and its progeny but ignore newer cases that defeat their claim. Most notably, in *People v. Rubacalba*, *supra*, 6 Cal.4th 62 (*Rubacalba*), a case involving the controlled substance cocaine, the high court limited *Leal*: "The chemical analysis of the material possessed need only establish the existence of a controlled substance. A quantitative analysis establishing the purity of the controlled substance is not required. . . . [¶] . . . [T]he *Leal* usable-quantity rule prohibits conviction only when the substance possessed simply cannot be used, such as when it is a blackened residue or a useless trace. It does not extend to a substance containing contraband, even if not pure, if the substance is in a form and quantity that can be used. No particular purity or narcotic effect need be proven." (*Id.* at pp. 65-66.) Adding to *Rubacalba*, Division Three of our own court reasoned in *People v. Sherman* (1997) 57 Cal.App.4th 102 (*Sherman*), a case involving cocaine base, that a general statutory reference to substances "having a stimulant effect on the central nervous system" (§ 11054, subd. (f)) "is meant to be descriptive, not restrictive. That is, the phrase merely describes the drugs listed in subdivision (f)—it does not require the People to prove in each prosecution that the specific substance at issue has an actual stimulant effect on the central nervous system." (*Sherman*, *supra*, 57 Cal.App.4th at p. 105.) Methamphetamine, the controlled substance in our case (§ 11055, subd. (d)(2)), is described with the same language (§ 11054, subd. (f) ["substances having a stimulant effect on the central nervous system") that *Sherman* holds to be descriptive, not restrictive.

A trial court must instruct sua sponte on "general principles of law" (*People v. Montoya*, *supra*, 7 Cal.4th at p. 1047), but the law here was against defendants' position. It follows that no element of the offense was omitted, and error is not shown.

## V. *Sentencing*

**Selection of aggravated terms.** Defendants challenge in several ways the court's selection of upper terms at sentencing, which was consistent with the probation report recommendations and the court's tentative rulings. No error is shown.

Defendants claim the court made a prohibited dual use of the 10 pounds of the drug both to enhance (§ 11379.8) and to aggravate for "a large quantity of contraband" (Cal. Rules of Court [hereafter cited by rule], rule 421(a)(10)), in violation of Penal Code section 1170, subdivision (b). The point is waived for failure to raise it below. (*People v. Scott* (1994) 9 Cal.4th 331, 353, 356.) Alternatively, it lacks merit. Judge Cissna explained in each case that he was relying not on the 10 pounds needed to enhance, but on the quantity in excess of that amount, and he found that the amount was actually around 20 pounds. Defendants incorrectly insist the judge was limited to using the 10 pounds found by the jury. A court at sentencing may make findings by a mere "preponderance of the evidence" (rule 420(b)); the difference in standard of proof, in fact, allows the judge to find by a preponderance of the evidence facts that the jury has not found true beyond a reasonable doubt. (*People v. Lewis* (1991) 229 Cal.App.3d 259, 264; *People v. Levitt* (1984) 156 Cal.App.3d 500, 515.) There was no inconsistency here in any event since the jury was never asked to pass upon the higher weight. Defendants' claim that the evidence did not allow a finding of weight in excess of 10 pounds is answered by our discussion in part II (*ante*). The rule 421(a)(10) factor is supported.

For the three testifying defendants—Aguirre, Madueno and Martinez—the court cited perjury as an aggravating factor. Without citing authority, defendants perfunctorily complain that perjury does not fall squarely fall within the language of any rule (but see rule 421(a)(6) (defendant "suborned perjury, or in any other way illegally interfered with the judicial process")) and that their right to testify was "chilled." We reject the claims. First, as Judge Cissna noted, whether perjury is specifically listed is unimportant, for the listed rule criteria are not exclusive and may be supplemented if stated on the record (rule 408(a); *People v. Flores* (1981) 115 Cal.App.3d 924, 928), as was done here. Second, defendants cite no authority for their "chill" argument, but our own research reveals that state and federal case law rejects any right to commit perjury and allows reliance on perjury to aggravated so long as the judge adequately states for the record the elements of perjury. (*People v. Howard* (1993) 17 Cal.App.4th 999, 1002-1005; accord *People v. Aragon* (1992) 11 Cal.App.4th 749, 764-765.) If defendants mean to argue that there was

an inadequate statement here, they have waived the issue by not raising it below (*People
v. Middleton* (1997) 52 Cal.App.4th 19, 36-37) and have waived it again on appeal by not
articulating it.

Ayon did not testify and was *not* found to have perjured himself, but the court
relied on his prior criminal record, particularly a felony drug-sale conviction, as showing
increasingly serious convictions (rule 421(b)(2)). The court also found, for his case only,
that the crime involved a great amount of damage (rule 421(a)(9)). Ayon does not
challenge either of those aggravating factors.

The court further found, in the cases of Aguirre, Martinez, and Ayon, that each
could have been, but was not, given a consecutive term for another crime (rule 421(a)(7))
—namely, the count-3 hazardous waste disposal. No specific challenge is raised to this,
and our dual-use analysis, *post*, defeats any idea that Penal Code section 654 precluded
consecutive terms.

The court found, for each defendant, that the manner of the crime's commission
showed planning, sophistication or professionalism (rule 421(a)(8)). Again without anal-
ysis, defendants perfunctorily offer that they were "basically standing around drinking
beer" and hardly involved in the planning or production. Obviously, the jury found far
more involvement. Nevertheless, we presume that Judge Cissna, while impressed with
the overall size and sophistication of the operation, appreciated the role of each defendant
as shown by the evidence. We presume further that he assigned individual weight to the
various aggravating factors and made his overall decisions accordingly.

Judge Cissna found, in mitigation, that each defendant except Ayon had no prior
record (rule 423(b)(1)). Each defendant faults the judge for not accepting arguments by
their counsel below that their individual roles were passive or minor (rule 423(a)(1)) and
for finding that the aggravating circumstances preponderated. However, we presume that
the judge considered all relevant circumstances (rule 409), and the arguments by counsel
below affirmatively show that the judge did consider all possible mitigation. He was not
required to articulate reasons for minimizing or disregarding mitigating factors (*People v.
Lamb* (1988) 206 Cal.App.3d 397, 401; *In re Handa* (1985) 166 Cal.App.3d 966, 973;

40

*People v. Thompson* (1982) 138 Cal.App.3d 123, 127), and this defeats the argument that he failed to exercise discretion. The judge also heard witnesses on behalf of Aguirre and Martinez. No abuse of discretion appears in the decisions that aggravating factors outweighed those in mitigation.

**Failure to strike enhancement.** A 10-year weight enhancement is "in addition to any other punishment provided by law" (§ 11379.8, subd. (c)), but a court has discretion to strike "if it determines that there are circumstances in mitigation of the additional punishment and states on the record its reasons for striking the additional punishment" (*id.*, subd. (d)). Defendants claim the court "failed to exercise its discretion," but the record fails them: "Where the Legislature establishes a sentencing norm and requires the court explicitly to justify a departure therefrom, and the court sentences in conformity with the legislative standard, all that is required on the appellate record is a showing that the court was aware of its discretion to select an alternate disposition." (*People v. Langevin* (1984) 155 Cal.App.3d 520, 524.) No explanation for the decision need appear (*ibid.*; rule 428(a)), and the court may consider any mitigating or aggravating circumstances in deciding whether to strike an enhancement (rule 428(a)).

Awareness of discretion to strike plainly appears. At sentencing, counsel for Aguirre alluded to a formal written motion to strike the court had separately considered and denied two weeks earlier. Counsel for Madueno raised such a motion at sentencing, and the court expressly denied it, even giving reasons. It thus appears that the court was aware of its discretion and must have remained aware when, minutes later, it sentenced Martinez. In all three cases, moreover, on similar factual considerations (rule 413), the court considered whether unusual circumstances warranted probation; it found no unusual circumstances and said it would have denied probation in any event. Weeks later, at the separate sentencing for Ayon, defense counsel reminded the court that Ayon had "joined in" the prior motions to strike and renewed the motion; the court denied it. "[T]he court's awareness and exercise of discretion is manifest." (*People v. Langevin, supra*, 155 Cal.App.3d at p. 524.)

**Stay of the hazardous waste punishment.** The convictions on count 3 were
under section 11374.5, which provided in subdivision (a) at the time of the offense:
"Any manufacturer of a controlled substance who disposes of any hazardous substance
that is a controlled substance or a chemical used in the manufacture of a controlled
substance in violation of any law regulating the disposal of hazardous substances or
hazardous waste is guilty of a public offense punishable by imprisonment in the state
prison for two, three, or four years or in the county jail not exceeding one year." (Stats.
1993, ch. 549, § 1, p. 2775.) The court imposed *concurrent* seven-year terms for each
defendant on this count, and each defendant contends that his term had to be *stayed* under
Penal Code section 654, which treats concurrent sentences as prohibited multiple punish-
ment (*In re Adams* (1975) 14 Cal.3d 629, 636). Defendants did not argue this below but
may do so now because an erroneous failure to impose such a stay yields an
"'unauthorized sentence'" reviewable for the first time on appeal. (*People v. Scott,
supra*, 9 Cal.4th at p. 354 & fn. 17.)

We find no forbidden multiple punishment. Penal Code section 654 "literally
applies only where such punishment arises out of multiple statutory violations produced
by the 'same act or omission.' [Citation.] However, because the statute is intended to
ensure that defendant is punished 'commensurate with his culpability' [citation], its pro-
tection has been extended to cases in which there are several offenses committed during
'a course of conduct deemed to be indivisible in time.' [Citation.]" (*People v. Harrison*
(1989) 48 Cal.3d 321, 335.) "'Whether a course of criminal conduct is divisible and
therefore gives rise to more than one act within the meaning of section 654 depends on
the *intent and objective* of the actor. If all of the offenses were incident to one objective,
the defendant may be punished for any one of such offenses but not for more than one.'"
(*People v. Latimer* (1993) 5 Cal.4th 1203, 1208, quoting from *Neal v. State of California*
(1960) 55 Cal.2d 11, 19.) "If, on the other hand, defendant harbored 'multiple criminal
objectives,' which were independent of and not merely incidental to each other, he may
be punished for each statutory violation committed in pursuit of each objective, 'even
though the violations shared common acts or were parts of an otherwise indivisible

42

course of conduct.'" (*People v. Harrison, supra,* 48 Cal.3d at p. 335.) A judge who imposes multiple punishment implicitly finds that the crimes involved more than one objective, "a factual determination that must be sustained on appeal if supported by substantial evidence." (*People v. Osband* (1996) 13 Cal.4th 622, 730.)

Defendants claim Judge Cissna misunderstood the pertinent principles because, when he imposed the current terms for Aguirre, Madueno and Martinez, he stated that because there was "a single course of conduct," he was running the count 3 term "concurrent" to the term on count 1. Defendants claim it was inconsistent to find a "single course of conduct" yet not impose a stay under Penal Code section 654. We disagree. A "single course of conduct" does not bar multiple punishment unless it is "indivisible." (*People v. Harrison, supra,* 48 Cal.3d at p. 335.) Also, it seems more likely that Judge Cissna was alluding not to double punishment, but to the criteria for running sentences consecutive or concurrent, one of which is whether the offenses "were committed at different times or separate places, rather than committed so closely in time and place as to indicate a single period of aberrant behavior" (rule 425(a)(3)). "Single course of conduct" is an apt shorthand expression for that criterion, and this interpretation is reinforced by the fact that the judge declared this to be a reason to run the count 3 term "concurrent." It is further reinforced by the record at the sentencing of Ayon, held weeks later, where the judge closely tracked his previously articulated reasons and, in running count 3 concurrent, said this was "because I determine that the offense occurred at the same place and time . . . ." No misunderstanding appears. The presumption that duty was regularly performed (Evid. Code, § 664) stands unrebutted on this record.

Finally, the judge's implied finding that the crimes involved more than one objective (*People v. Osband, supra,* 13 Cal.4th at p. 730) is supported by substantial evidence. Two contrary arguments are offered. First: "[W]aste is an integral part of the manufacturing process. Therefore, count 3 is an integral part of the objective of counts 1 and 2, i.e., the production of methamphetamine." This argument misses the point. We may accept that "waste is an integral part of the manufacturing process," but the count 3 offense was for *illegally disposing* of that waste, not creating it, and substantial evidence

shows that *illegal* disposal is not an integral part of manufacturing. Melissa Ann Martel, a certified hazardous materials specialist working for Humboldt County, testified that the sludge found at the property could be lawfully disposed of if properly contained, labeled, placarded, and transported to a hazardous waste transfer, storage or treatment facility. While she testified that there was no such facility within the county, she was testifying about steps the county would have to take to clean up the site, and this implied the avail-ability of such facilities outside the county. Finally, we note that waste disposal was not charged as a conspiratorial act and thus was not integral to that charge.

Defendants' other argument is: "Manufacturing methamphetamine, conspiracy to manufacture methamphetamine and disposing of the hazardous waste resulting from such manufacturing involve a single course of conduct with a single intent and objective, i.e., financial gain." We find "financial gain" too sweeping. Other courts have rejected as "too broad and amorphous" single objectives of "sexual gratification" for sex offenses (*People v. Perez* (1979) 23 Cal.3d 545, 552; *People v. Bradley* (1993) 15 Cal.App.4th 1144, 1157) or "benefit[ting a] gang" for gang-related offenses (*People v. Akins* (1997) 56 Cal.App.4th 331, 339). "Financial gain" is similarly indistinct. It could include, in our case, a money laundering or booking operation run at the methamphetamine lab and would seriously disserve the purpose of Penal Code section 654 to insure that punishment is commensurate with culpability (*People v. Latimer, supra*, 5 Cal.4th at p. 1211).

It is doubtful, moreover, that "financial gain" played much of a role in defendants' illegal disposal of the sludge. They presumably did save money by not disposing of it in compliance with the law, at a proper facility, but their more probable objective was to get rid of it so as to avoid leaving incriminating evidence and, perhaps, to allow for further methamphetamine production. No published case appears to discuss waste disposal in this context, but a useful analogy is to cases that have allowed multiple punishment for acts posing "separate and distinct" risks or harms and involving, first, a criminal act, and second, an effort to avoid discovery of that act. (*People v. Braz* (1997) 57 Cal.App.4th 1, 11 [two acts of child endangerment, one for deadly physical abuse and the other a failure to seek medical aid]; *People v. Trotter* (1992) 7 Cal.App.4th 363, 368 [two gun shots in

44

close succession, one to kill and the other to ward off a pursuing officer].) Here, the acts posed separate and distinct risks and affected distinct sets of victims. The manufacturing of methamphetamine poses primary risks to drug users and secondary risks to society at large, which must contend with resulting health and safety costs. The illegal dumping of waste product, however, causes separate and distinct harm to landowners and neighbors. Testimony by the cabin owner here showed the county health department had prevented anyone from living at the cabin until the waste was cleaned up. This cleanup often falls to a county, another distinct victim recognized by the statute, which allows a public agency like the county to recover cleanup costs from the defendant. (§ 11374.5, subd. (b); *People v. Madrana* (1997) 55 Cal.App.4th 1044, 1048.)

Thus the evidence supports an implied finding that defendants harbored divisible intents or objectives in manufacturing methamphetamine on the one hand, and illegally dumping the toxic by-products on the other, even though this was part of a single course of conduct attending the drug production. Penal Code section 654 did not bar imposing concurrent terms for count 3.

## DISPOSITION

The judgment is affirmed.

45

_____

Lambden, J.

We concur:

_____

Haerle, Acting P. J.

_____

Ruvolo, J.

A084742 - People v. Manuel Nunes Martinez
A084909 - People v. Jorge Paez Aguirre
A085103 - People v. Felipe Carrasco Madueno
A085315 - People v. Jose Alberto Ayon

46

# EXHIBIT COVER PAGE

B

EXHIBIT

Description of this Exhibit: Declaration of Jose Ayon

Number of pages to this Exhibit: ___2___ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

## DECLARATION OF JOSE AYON

1. I was one of four defendants in Humboldt County case number 9823332 tried before Judge Timothy Cissna. This case was appealed and the Court of Appeal affirmed my conviction in case number AO85315.

2. During my trial I was forced to wear leg restraints even though I explained that the restraints were injuring me. My attorney's attempt to have the restraints removed before trial was denied by the trial judge.

3. Everyday when I came to courthouse the leg restraints were put on at 8 a.m. They were not removed until the court proceedings finished at noon. Even during court breaks the restraints were not removed.

4. I complained to my attorney, my co-defendants and my fellow inmates about the effects of the restraints, which caused a wound because of rubbing near my knee. My co-defendants also had wounds because of wearing the restraints. After I got one wound on my leg from the restraints and didn't want to put the restraints on my other leg and get another wound. I preferred to have one wound instead of two.

5. When I moved my leg the restraints made a clattering noise that was loud enough to be heard by anyone in the courtroom. This noise occurred whenever anyone wearing a restraint moved his leg. It happened even when I was seated during the trial. The restraints also made me walk stiffly. I believe that both the noise and the odd way my co-defendants and I walked were heard and seen by the jurors during the trial.

6. The restraints caused me to get cramps in my leg. The cramps used to draw me out of the whole court procedure. I couldn't concentrate. My ability to think about what was going on and tell things to my lawyer was definitely effected.

7. The restraints had a negative impact on my trial. I couldn't fully participate in my defense and many times couldn't pay attention to the witnesses or other proceedings. I believe that the jurors were given the impression that I was a bad person because I needed to be put in leg restraints even though I didn't do anything to deserve being treated that way.

I declare the forgoing to be true and correct under penalty of perjury. Sworn this _25_ day of _Dec._, 2002 at Soledad, California.

Jose Ayon

Exhibit___

2

# EXHIBIT COVER PAGE

| C |
|---|

EXHIBIT

Description of this Exhibit: Declaration of Trial Counsel

Number of pages to this Exhibit: ___3___ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

**RUSSELL J. CLANTON C.S.B. 152229**
**Attorney at Law**
791 8ᵗʰ Street, Suite "R"
Arcata, CA 95521
Telephone: (707) 825-6587
Facsimile: (707) 825-6588

Attorney for Defendant and Appellant
**JOSE AYON**

# IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
# IN AND FOR THE COUNTY OF HUMBOLDT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) Case No. **A085315** |
| Plaintiff, | ) |
| | ) (Superior Ct. #982332) |
| vs. | ) |
| | ) **DECLARATION OF** |
| **JOSE AYON,** | ) **RUSSELL J. CLANTON** |
| | ) |
| Defendant and Appellant. | ) |

I, **RUSSELL J. CLANTON**, declare the following:

1.)    I was the court-appointed attorney for the defendant herein;

2.)    The matter proceeded to trial before the Honorable Timothy Cissna in the Humboldt County Superior Court.

3.)    At the commencement of the jury trial there was discussion among the court security staff, the Court, the District Attorney and the defense teams as to what should be the degree of restraints imposed upon the various co-defendants in the matter. While several forms of shackling were proposed, the ultimate decision by the Court and by the court security staff was to apply what is known as a leg brace on the co-defendants.

4.)    This device was worn under the pants by the co-defendants and was a device that went from approximately mid-calf to above the knee. At the knee there was a metal hinge that ostensibly allowed the person who was wearing the device to walk. However, if this person were to engage in anything but a walk the device was designed to lock in place with the restrained individuals leg in a stiffened, non-bending position.

5.)    The defense objected to the placement of these devices on the co-defendants.

Attachment "D"                      1
                              Exhibit              EXHIBIT C
                                                   (3 pages)

6.)    This objection was overruled by the Court and the individuals attended trial with these devices in place.

7.)    I was present at all times during the course of the trial and witnessed the co-defendants entering and exiting the courtroom.

8.)    The device as applied did in fact alter the normal gait of the co-defendants which was plainly noticeable.

9.)    Additionally, there was an audible clicking and creak associated with the flexing movement with each step the co-defendants made as they walked to the counsel table or exited the courtroom.

10.)    There was discussion among the co-defendant attorneys and the co-defendants regarding the discomfort associated with the wearing of these devices as well. Specifically, Mr. Ayon, my client, complained of a chaffing and a pain associated with the enforced rigidity and odd angle the device forced his leg into. Several times during the course of the trial my client requested that he be afforded the opportunity to leave the courtroom and have the device removed in order to alleviate these symptoms. At more than one point in the proceedings the need for such relief was indicated to the Court and the Court ultimately ruled in a manner that condescended to the complaints of the co-defendants.

11.)    It is my belief that during the course of the trial itself Mr. Ayon was distracted and incapable of applying his full attention to the proceedings or to communicate with his trial counsel inasmuch as he was in a constant state of physical anguish resulting from the pressure and pain of the device which had been objected to by counsel.

12.)    Additionally, my recollection is that on at least one occasion a co-defendant was observed walking to the witness stand by jurors. This occurred despite the Court attempting to preclude such observations by having CO-defendant witnesses seated in the witness box prior to entry of the jurors. The altered gait was plainly visible and the creaking of the hinge mechanism was overtly audible.

13.)    It is my belief that the prejudice resulting from the juror's observation of restraints imposed upon the co-defendants contributed in a significant fashion to their verdict of guilty in this matter.

2

Exhibit

1    14.)    It is my belief that Mr. Ayon's right to a fair trial was severely compromised by the

2  imposition of this inhumane restraint device during the course of his trial.

3    I declare under penalty of perjury the foregoing information is true and correct to the best

4  of my knowledge and belief.

5  DATED:

6

7                                    RUSSELL J. CLANTON
                                     Attorney for JOSE AYON
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit

# EXHIBIT COVER PAGE

D

EXHIBIT

Description of this Exhibit: State Court Motion

Number of pages to this Exhibit: ___6___ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

1   JAMES J. STEINBERG, PUBLIC DEFENDER OF HUMBOLDT COUNTY
    MICHAEL P. EANNARINO SBN 152251
2   1001 FOURTH STREET
    EUREKA, CALIFORNIA 95501
3   TELEPHONE: 707 445-7634

4   ATTORNEYS FOR DEFENDANT
    FELIPE CARRASCO MADUENO

5

6

7
              IN THE SUPERIOR AND MUNICIPAL COURT OF HUMBOLDT COUNTY
8                       STATE OF CALIFORNIA    EUREKA BRANCH

9

10

11  THE PEOPLE OF THE STATE OF CALIFORNIA,    )    CASE NO. CR981892 (formerly
                                              )    CR981884M)
12                    PLAINTIFF,              )
                                              )    NOTICE OF MOTION AND
13  VS.                                       )    MOTION COMPELLING
                                              )    DISCLOSURE OF INFORMANT
14  FELIPE CARRASCO MADUENO,                  )    IDENTITY AND RELATED
                                              )    DISCOVERABLE MATERIALS OR
15                    DEFENDANT.              )    IN THE ALTERNATIVE,
                                              )    DISMISSING THE INDICTMENT
16                                            )    Date: June 26, 1998
                                              )    Time: 8:30 a.m.
17                                            )    Dept.: 1
    _____)

18

19  TO: CLERK OF THE ABOVE-ENTITLED COURT, AND THE DISTRICT ATTORNEY OF

20  HUMBOLDT COUNTY

21         PLEASE TAKE NOTICE that on Friday, June 26, 1998, at the hour of 8:30 a.m., or as

22  soon thereafter as the matter may be heard in the above-entitled court, Defendant by and through

23  his counsel, will move for an order compelling disclosure of the true identity and present

24  whereabouts of the confidential informants (both the confidential informant and the confidential

25  citizen informant) in this case, and all related discoverable materials, reports and background,

26  and for disclosure of all information provided to law enforcement by the confidential informants,

27  including but not limited to the to the information which is presently under seal in page 7-11 of

28                                      1
                                              EXHIBIT D (6 pgs)

1  the affidavit for search warrant no SW4041, or in the alternative, dismissing the indictment.

2       Defendant also moves for an order requiring the People to provide to the defense the

3  following:

4       (1)    The identity, true name, known alias, date of birth, physical description and likely

5  whereabouts of both the confidential informant and the confidential citizen informant utilized

6  and referred to in the affidavit filed in support of Humboldt County Search Warrant SW 4041 in

7  this case;

8       (2)    Any tape recordings made by either confidential informant in connection with the

9  above-entitled action in the possession of the People or the Humboldt County Drug Task Force

10  or any other law enforcement agency or subject to their control that relates to the investigation

11  outlined in the affidavit in support of search warrant number 4041;

12       (3)    A copy of all pay vouchers associated with any transactions involving the

13  defendants;

14       (4)    All information in the possession of the People which in any way tends to relate to

15  the reliability and/or credibility of the informants, including copies of police reports and witness

16  statements regarding this or previous criminal acts known to cooperating law enforcement

17  agencies, whether charged or uncharged, a list of all criminal prosecutions, and all actual and

18  prospective dispositions of any criminal investigations known to local law enforcement agencies

19  or to the District Attorney;

20       (5)    All consideration, whether express or implied, oral or documented in some

21  manner, offered to the informants that would tend to encourage said informants to cooperate in

22  the investigation in any way;

23       (6)    The identity of and whereabouts, and statements of all citizen informants who

24  purport to have personal knowledge of facts and circumstances linking defendants to the charges

25  in this case;

26       (7)    The contents of pages 7-11 of the affidavit in support of Humboldt County Search

27

28                                        2

1 | Warrant Number 4041.

2 |     This motion is made on the ground that the above-mentioned informants are both material

3 | witnesses to the innocence or guilt of the defendant(s) as to the indictment herein, and that

4 | receipt of the foregoing information is essential to the preparation of the trial in this case.

5 |     This motion is based on this notice of motion, the attached memorandum of points and

6 | authorities the records and files herein, and such other evidence, argument and authorities as may

7 | be offered at the hearing on this motion.

8 | Dated: June 12, 1998

9 |                               JAMES J. STEINBERG
                              PUBLIC DEFENDER OF HUMBOLDT COUNTY

10 |

11 |                               BY:

12 |                               MICHAEL P. EANNARINO
                              DEPUTY PUBLIC DEFENDER

13 |

14 |                          * * * * * * * * * * *

15 |                       STATEMENT OF FACTS

16 |     It is alleged as follows: In October of 1997, agent Cox of the Drug Task Force spoke with

17 | a confidential informant and was advised that several Hispanic males were involved in the

18 | manufacture of methamphetamine in a residence in Bridgeville. At some unknown time between

19 | October of 1997 and April 16 of 1998, a confidential citizen informant advised Deputy

20 | McCollister of the Humboldt County Sheriff's Department that unknown Hispanic subjects were

21 | involved in manufacturing methamphetamine at the Donald Casey residence I Bridgeville. The

22 | details of this information and these contacts were sealed on pages 7-11 of the affidavit

23 | supporting the warrant served in this case.

24 |     As a result of this information, a van was stopped in which defendant was a passenger,

25 | and a search warrant was issued authorizing the search of three vehicles and two residences.

26 |     There are no facts offered by either the police reports or the affidavit in support of the

27 |

28 |                         3

1   warrant to indicate the reliability of the confidential informants nor facts to indicate that the

2   safety of the confidential informants would be at risk if their identity was disclosed.

3          Disclosure is necessary because the informants may be necessary and material witnesses

4   to any activities in the residence in Bridgeville, and may provide exonerating information with

5   respect to any of the defendants.

6          Without disclosure of the identify of the confidential informants and the information

7   sealed in the closed portion of the affidavit, and related discovery, defendant Felipe Madueno

8   will be denied a fair trial.

9                           **POINTS AND AUTHORITIES**

10

11                                        **I**

12   **THE INFORMANTS ARE MATERIAL AS TO THE GUILT OR INNOCENCE**
     **OF DEFENDANT IN THIS CASE AND FAILURE TO DISCLOSE THE IDENTITY OF**
13   **THE INFORMANTS, RELATED DISCOVERY AND THE FACTS IN THE SEALED**
     **AFFIDAVIT WILL RESULT IN A MISCARRIAGE OF JUSTICE**
14

15          It is well-settled that law enforcement agencies must disclose information regarding a

16   confidential informant when the defense makes a showing that said information might be

     material on the issue of guilt or innocence [*Eleazer v. Superior Court*, (1970) 1 Cal.3d 847, 851].
17
     The penalty for failing to do so is dismissal [*Twiggs v. Superior Court*, (1983) 34 Cal.3d 360,
18
     365; *People v. Borunda*, (1974) 11 Cal.3d 523, 527; *People v. McShann*, (1958) 50 Cal.2d, 802,
19
     808]. An accused has the constitutional right to cross-examine witnesses and to produce
20
     witnesses on his own behalf at trial, hence the reasoning underlying the disclosure requirement
21
     before trial.   The procedure for ruling on a claim of privilege as to the informants' identity is set
22
     out in *California Evidence Code* §§1041 and 1042.
23
            The informant need not be present at the time of the actual arrest [*People v. Williams*,
24
     (1958) 51 Cal.2d 355,    ], nor is it necessary for the defendant to prove that the informant will
25
     provide material evidence but only to show "some evidence of a possibility" [*Price v. Superior
26
     Court*, (1970) 1 Cal.3d 836, 843-84] - or a "reasonable possibility that the anonymous informant
27

28                                        4

1  . . . could give evidence on the issue of guilt which might result in defendant's exoneration"

2  [*People v. Garcia*, (1967) 67 Cal.2d 830, 839-840].

3      To make the required showing of materiality on the issue of guilt or innocence, a

4  defendant need not demonstrate that the informant would give favorable testimony or show what

5  the informer's testimony would be [*People v. Tolliver*, (1975) 53 Cal.App.3d 1043-1044].

6  Rather, the accused need only show that the informant was "in a position to perceive" . . . either

7  the commission or the antecedents of the alleged crime." [*People v. Ingram*, (1978) 87

8  Cal.App.3d 832, 839, quoting *Williams v. Superior Court*, supra, at p. 423. The court in *Williams*

9  analyzed the controlling Supreme court decisions and concluded:

> [T]he evidentiary showing required by those decisions is not as to
> the exculpatory nature of the informer's potential testimony but
> merely as to the quality of the vantage point from which the
> informer viewed either the commission or the immediate
> antecedents of the alleged crime. The noted Supreme Court cases
> ask in effect, "What was the informer in a position to perceive?"
> If the evidence shows that the informer had a sufficiently
> proximate vantage point, those Supreme court decisions simply
> speculate concerning the informer's potential testimony and hold
> that the defendant has demonstrated a reasonable possibility that
> the informant would give evidence which might result in the
> defendant's exoneration. Speculation as to such informer's
> testimony is consistent with cases which discern a constitutional
> right in the accused to seek out the informer to inquire what he
> knows. Id. at 423-324.

19      Once the defendant has met this initial showing, and has resorted to this acceptable level

20  of speculation, disclosure is required unless the prosecution requests an <u>in camera</u> hearing at

21  which time the informer is required to testify under oath [*People v. Gooch*, (1983) 139

22  Cal.App.3d 342, 344-345]. After the hearing, disclosure is required unless the court concludes

23  there is no reasonable possibility that the non-disclosure deprive defendant of a fair trial [*People

24  v. Williams*, supra, *California Evidence Code* §1042]. If the informant is unavailable for the in

25  camera hearing, dismissal is required [*People v. Allen*, (1980) 101 Cal.App.3d 285, 291, 294.

26      It is important to note that courts have reversed convictions in non-disclosed informant

27  cases even where sales were made directly to police officers, and the other officers testified to the

28                                                5

1  identity of the seller [*People v. Durazo*, (1959) 52 Cal.2d 354; *People v. Williams*, (1958) 51

2  Cal.2d 355; *Bowens v. Superior Court*, (1975) 47 Cal.App.3d 127]. Federal Law on informant

3  disclosure is substantially in accord [*Roviaro v. United States*, (1957) 350 U.S. 53; *Velarde-*

4  *Villareal v. United States*, (9th Cir., 1965) 354 F.2d 9; cf., *Franks v. Delaware*, (1978) 438 U.S.

5  154 (showing required for impeaching information where informant is not a material witness on

6  guilt or innocence).

7      In the case at bench, the confidential informants provided five pages of information to the

8  enforcement agency. The presumption is that individuals with that much knowledge possess

9  personal knowledge of details; someone with access to information and someone intimately

10  associated with all aspects of the alleged operation. A person with this knowledge is necessary

11  and material to the defense of the case. It is crucial for the defense to be able to ascertain the

12  confidential informant's ability to perceive places, events, and activities, and to determine the

13  potential bias and even possible culpability in the alleged crimes.

14      The critical question is whether the informant could exculpate defendant.

15                              **CONCLUSION**

16

17      The reports, tapes, notes evidence and other materials described and requested in this

18  motion are essential materials needed by the defense to both test the credibility and reliability of

19  the informants in this case as well as to establish the innocence of defendants.

20      For these reasons, defendant respectfully requests that the court order disclosure of the

21  identity of the informants, the related discoverable materials and the disclosure of the sealed

22  portions of the affidavit.

23  Dated: June 12, 1998            JAMES J. STEINBERG
                                    PUBLIC DEFENDER OF HUMBOLDT COUNTY
24

25                                  BY: _____
                                    MICHAEL P. EANNARINO
26                                  DEPUTY PUBLIC DEFENDER

27

28                                       6

# EXHIBIT COVER PAGE

E

EXHIBIT

Description of this Exhibit:    Relevant Trial Transcripts

Number of pages to this Exhibit: ____39____ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

14

1      THE COURT:  You can more than see it.  I'll

2   provide you with a copy of it.  If you come back -- if

3   you're not going to be retained, if you bring that with you,

4   please.

5      MR. MORRISON:  I will.  Thank you.

6      THE COURT:  Mr. Clanton, do you represent one of

7   these defendants?

8      MR. CLANTON:  Yes, I do, Your Honor, Jose Ayon,

9   who's present in custody, Your Honor.  And for

10   clarification, Your Honor, I believe that the date we

11   received before Judge Watson for a trial in this case was

12   July 13th.

13      THE COURT:  July the 6th.

14      MR. CLANTON:  July the 6th.  I'll amend my file,

15   Your Honor.

16      THE COURT:  We'll be adding a date to that, by the

17   way.  It will be on for June the 30th, at three thirty, for

18   trial confirmation.  Then this matter's on today for bail/

19   O.R. hearing.

20      MR. CLANTON:  Yes, Your Honor.  Your Honor, I've

21   discussed Mr. Ayon's status in this country.  He's informed

22   me that he's been in the United States for over six years.

23   He is married and his wife is a native of California.  He

24   has two children.  He has significant family ties to this

25   state, particularly to this jurisdiction, with the -- his

26   wife and his two children.  In looking at the information we

27   received so far from the District Attorney, there's no

28   indication of any violence or any prior criminal history

15

1    involving Mr. Ayon.  I understand the manner in which the

2    Court has to look at the current accusations.  I can simply

3    communicate to the Court that Mr. Ayon intends to respond

4    responsibly to these charges.  His family is something

5    that's very important to him.  He does have potential work

6    possibilities here in this area.  He's been discussing that

7    with his wife.  I do believe that his return to the court is

8    -- is fairly certain.  He's indicated that the fact that the

9    -- there was an attempt to -- at least to deport him was

10   something he would have never considered on his own, that he

11   preferred to stay here and to address these charges.  I know

12   there's been lots of conjecture with regards to the

13   aspirations of these defendants, including Mr. Ayon, with

14   regards to that.  Mr. Ayon is very much tied to this

15   community.  His -- his wife, who he's been married to for

16   several years, and his two children live here, are citizens

17   of this country.  And it certainly is his aspiration to

18   remain here.  And to suggest that he might want to flee to

19   Mexico to avoid charges and, therefore, not return to this

20   court, I think, are -- are just that.  They're conjecture

21   and speculation.  And Mr. Ayon has convinced me that those

22   certainly are not in his plans.

23          So based on those comments, Your Honor, I think

24   the Court has a reasonable basis for considering release on

25   his own recognizance, if not at least a significant

26   reduction in the amount of bail.  I think two million

27   dollars at this point is -- is a quantum leap in terms of

28   security.

54

1    minutes.

2        Q.    Now, you indicated you did receive information

3    about a maroon van while you were still at your residence;

4    is that correct?

5        A.    That's correct.

6        Q.    And is it true that the information that you

7    received while at your residence was that if the van left,

8    you were going to be instructed to stop it?

9        A.    That's correct.

10       Q.    What time did that request come in?

11       A.    I think maybe half an hour to an hour before --

12   before that, maybe a little longer.

13       Q.    And you received no other information about the

14   van except that you were going to be entrusted with the

15   responsibility of stopping it should it leave?

16       A.    No.    They believed -- the agents believed that

17   that van was possibly involved or was involved with the

18   activity that was going on up the hill.    You can't -- you

19   wouldn't be able to drive that van up that hill.    It was

20   behind the first gate by the second gate.    That van would

21   not make it up that hill.

22       Q.    And at that point in time, to your knowledge, no

23   illegal activity had been observed?

24       A.    I think that would be correct, yes.

25       Q.    Certainly none was observed by you?

26       A.    That is correct.

27       Q.    And from the point of time at which you first

28   observed the van to the point of time that you stopped it,

55

1    you observed no illegal activity?

2        A.    No, I did not.

3        Q.    Now, you spoke during your testimony about a

4    confidential informant.  You indicated that the confidential

5    citizen informant received his or her information from

6    another individual.  Do you know who that individual was?

7        A.    Yes, I do.

8        Q.    Did you ever have a conversation with that

9    individual?

10       A.    Not regarding this situation, no.

11       Q.    Do you know that individual's relationship with

12   Mr. Casey?

13             MR. KEAT:  Objection.  Information that tends to

14   identify a confidential informant is protected by privilege.

15             THE COURT:  Sustained.

16             MR. EANNARINO:  Do you know that individual's

17   criminal background?

18       A.    Not specifically, no.

19       Q.    Do you know if that individual was involved in any

20   kind of disputes with Mr. Casey?

21       A.    I don't think so, no.

22       Q.    Did you ever personally verify the basis of that

23   person's information?

24       A.    Repeat that one more time for me, Counsel.

25       Q.    Just, logically, it would appear that this person

26   who gave the confidential citizen informant the information

27   must've had a reason for giving that person the information.

28   My question is, did you verify their basis of information?

56

```
 1      A.    Yes.

 2      Q.    When did you do that?

 3      A.    Basically, when the one citizen gave it to the

 4   other citizen.

 5      Q.    And what date was that?  Can you tell us?

 6      A.    No, I could not.

 7      Q.    You said it was a few months before April?

 8      A.    Two or three.  It could have been in January.

 9   I --

10      Q.    Did you take any notes of that conversation?

11      A.    No, I did not.

12      Q.    Did you make any reports at all?

13      A.    No.  I just passed the information along to Agent

14   Cox.

15      Q.    So, it could have been as early as January of this

16   year?

17      A.    I just -- I don't -- I don't recall.

18            MR. EANNARINO:  Your Honor, at this time, we do

19   have a video of the general area of the road.  The two

20   options would be to either briefly call the person who took

21   the video to lay a foundation or simply show it to Deputy

22   McCollister and lay the foundation in terms of whether or

23   not he recognizes the area.

24            THE COURT:  Is the video something that you're

25   going to want to ask the witness about?

26            MR. EANNARINO:  Yes.  It is the video of the road

27   and the gate to the area and the general area of the stop.

28            THE COURT:  Approximately how long is the video?
```

87

1    A.    Passing on different information that I might've

2    learned, or he may have asked me to see if I observed

3    anything or what I learned.

4    Q.    Okay.  I'm -- I'm not clear.  When you say, he may

5    have asked you, are you saying he did ask you, or are you

6    speculating why you did that?

7    A.    You know -- this was an ongoing investigation.  As

8    far as I could determine, I didn't ask him a lot of the

9    specifics because a lot of their investigations are

10   confidential, and they don't tell normally -- you know.  So

11   I didn't delve into that.  He may have called and asked me a

12   question.  I may have had the answer for him.  I'm not

13   trying to be not telling the truth.  I just -- you know

14   -- conversations you pass -- you know -- everyday.

15   Q.    I understand.  What I'm -- I guess what I'm trying

16   to focus on is, were you part of the investigation?

17   A.    Not specifically, no.  I -- you know -- I was just

18   the resident deputy out there, any piece of the puzzle I

19   could add.  I was not in every day, every weekly, or every

20   monthly.  No, I was not.

21   Q.    So if I understand your testimony, after you

22   relayed the information, some information before April, of

23   the confidential informant, then you -- you proceeded to

24   provide whatever information came your way to Agent Cox?

25   A.    Whatever I could, yes.

26   Q.    Okay.  Do you remember how many times you provided

27   information to Agent Cox?

28   A.    Two or three, maybe four.  You know -- I have no

88

1   idea.

2       Q.      You'd never been up the road, yet you're

3   indicating that you relayed information about that road to

4   Agent Cox prior to April of this year; is that right?

5       A.      That's correct.

6       Q.      Okay.  The reason that you relayed that

7   information about that particular road was because -- you

8   can't recall whether it was because Agent Cox had asked you

9   or whether you just volunteered it; is that right?

10      A.      Well, I passed on the original information, and in

11  subsequent conversations that particular piece of property

12  we discussed.  So --

13      Q.      During those subsequent conversations, was there

14  any conversation -- was there any information about vehicles

15  that were associated with that property, the Casey property?

16      A.      Yes, there was.

17      Q.      During those conversations about those vehicles,

18  was there any conversation about a maroon van?

19      A.      Not prior to April 15th, no.

20      Q.      So the vehicles that were previously relayed to

21  Agent Cox by you in those conversations did not include this

22  maroon van?

23      A.      That's correct.

24      Q.      Did any of those -- strike that.  You indicated in

25  response to questions from Mr. Keat that the reason -- or at

26  least one of the reasons for the reduced traffic flow was

27  because it was wintertime.  This was April.  It was actually

28  spring; is that correct?

133

1    Keat.  Each of the other four defendants have filed a

2    written joinder.  If you don't have those two pleadings,

3    then you can contact those counsel and they'll provide those

4    to you.

5         MR. DASKAL:  Thank you, Your Honor.  I have a -- I

6    do have a written motion for joinder at this point.

7         THE COURT:  That joinder which is accepted and

8    will be filed relates to the next motion that I was going to

9    address.  And it sounds like you're already aware that Mr.

10   Eannarino has already -- has also filed a motion for

11   disclosure of the informant and related discoverable items.

12   I have made a finding of materiality on that and have

13   scheduled an in-camera hearing.  And -- and we will treat it

14   as though Mr. Alvarez has joined in that motion as well

15   pursuant to this same joinder.

16        With respect to other motions that you may wish to

17   file, there isn't much for the Court to say.  If you have

18   other motions, you should file them.

19        Now, the next thing as far as scheduling is Mr.

20   Robinson.

21        MR. ROBINSON:  Yes, Your Honor.  As I indicated to

22   the Court and some of counsel off the record, I have a

23   conflict on Thursday of next week.  My understanding --

24        THE COURT:  Thursday and Friday.

25        MR. ROBINSON:  My understanding is the Court was

26   gonna -- are we doing a schedule of Monday through Thursday?

27        THE COURT:  No.  We're doing a schedule of Monday

28   through Friday.

141

1          Mr. Keat.

2

3                          WAYNE COX

4                  having been previously sworn,

5                  resumed the witness stand and

6                  testified further as follows:

7

8             DIRECT EXAMINATION contd.

9          MR. KEAT:   You're Drug Task Force Agent Wayne Cox?

10    A.     Yes, sir.

11    Q.     When last we addressed the matter, we covered your

12    qualifications.  And I'd like to turn now to this particular

13    investigation.

14         In the course of your duties as a Drug Task Force

15    agent in October of 1997, did you receive confidential

16    information about the manufacture of methamphetamine?

17    A.     Yes, sir.

18    Q.     What was the nature of that information?

19    A.     Confidential informant advised me that several

20    Hispanic subjects, including Jose Ayon, Felipe Madueno, and

21    Ramon Martinez, were involved in the manufacturing of

22    methamphetamine at a remote location somewhere off of

23    Highway 36.

24    Q.     Was the location of the methamphetamine

25    manufacturing given as a residence?

26    A.     Not at that time.  It was just told to me as a

27    remote location.

28    Q.     And was it said that that location was near

142

1    Bridgeville -- Bridgeville?  I'm sorry.

2        A.    Yes.

3        Q.    The person who gave you this information indicate

4    the basis of his or her knowledge about that?

5        A.    Yes.

6        Q.    Okay.  Would revealing now the basis of that

7    knowledge tend to identify that person?

8        A.    I believe it would.

9        Q.    Did the person who provided you with this

10   information provide you with any information which you were

11   able to verify yourself?

12       A.    The -- the informant had supplied information that

13   I'd verified as being reliable or true through other

14   sources.  Yes.

15            MR. EANNARINO:  Objection.  Nonresponsive.

16            THE COURT:  Overruled.

17            MR. KEAT:  Did the person who provided you with

18   this information, to your knowledge, have any particular

19   motive for doing so?

20       A.    Yes, sir.

21       Q.    If you can provide us with that without revealing

22   or tending to reveal the identity of that person, what was

23   that motive?

24       A.    I believe the best way to say it would be that the

25   informant was paid or given consideration in a pending

26   criminal matter in exchange for the information, sir.

27       Q.    To your knowledge, did the person who provided

28   this information have a criminal history?

143

1    A.    To the best of my recollection, no.

2    Q.    After that time, did you have a discussion with

3    Sheriff's Deputy Tim McCollister about the same

4    investigation?

5    A.    Yes, sir.

6    Q.    And did he provide you with some additional

7    information?

8    A.    Yes, sir, he did.

9    Q.    Did he tell you that he'd received his information

10   from a confidential citizen informant?

11   A.    Yes, sir, he did.

12   Q.    Based upon your discussion with Deputy

13   McCollister, were you able to determine whether his

14   informant was the same as your informant?

15   A.    The two informants are not the same person.

16   Q.    Okay.  What I'd like to do now is turn to the

17   evening of April 15th, 1998, and the early morning of April

18   16th.

19         Late on April 15th, 1998, how were you occupied?

20   A.    I was participating to some extent in the

21   surveillance of a dirt road leading to Don Casey's residence

22   in Swain's Flat.

23   Q.    Did you have at that time the ability to monitor

24   radio traffic?

25   A.    Yes, sir.

26   Q.    Deputy McCollister didn't -- didn't know everyone

27   involved.  Maybe you can tell us a more complete roster of

28   the individuals involved out there on that night?

161

1    Nothing further.

2              THE COURT:  Mr. Clanton.

3

4                    CROSS-EXAMINATION

5              MR. CLANTON:  Agent Cox, you testified that

6    confidential informant with whom you had discussions was

7    paid.

8         A.    Paid or given consideration, yes, sir.

9         Q.    Did you actually give that confidential informant

10   any money?

11        A.    I -- I am the one that either paid him or gave him

12   consideration or arranged for his consideration to be

13   granted.  I --

14        Q.    Were there any other agents or officers aware of

15   that transaction?

16        A.    Oh, yes.

17        Q.    Who would they be?

18        A.    The -- Agent Diaz and my whole crew knew what was

19   happenin'.  I'm sorry.  That's kind of slang.  Agent Diaz

20   knew 'cause he was the co-case agent on my case.  And -- you

21   know -- the -- the other people at the Humboldt County Drug

22   Task Force knew -- knew the arrangement, yes.

23        Q.    And did you make this payment and/or consideration

24   on more than one occasion to this confidential informant?

25        A.    I believe so.

26        Q.    How many times?

27        A.    I don't believe it would be more than two.  I

28   don't believe it would be -- I don't believe it would be

162

1    more than two, sir.

2         Q.    Well, Agent Cox, you testified that there were

3    agents who were conducting surveillance of the Casey cabin?

4         A.    No.  Well, that's not what I testified to.  No, I

5    don't believe.

6         Q.    To your knowledge, was there any direct

7    observation of the Casey cabin taking place on the early

8    morning hours of April 16th?

9         A.    No, sir, not to my knowledge.

10        Q.    Now, you testified as well, Agent Cox, that to

11   your knowledge there were several people leaving that

12   property on the early morning hours of the 16th, correct?

13        A.    I believe that was the transmission of Agent -- or

14   Supervisor Lerner, sir.

15        Q.    You testified that there were two vehicles?

16        A.    Yes, sir.

17        Q.    And the vehicle other than the van which you

18   testified to were -- did you know who was in that vehicle?

19        A.    No, sir.

20        Q.    Did -- to your knowledge, did any of the other

21   agents present that evening know who was in that other

22   vehicle?

23        A.    No, sir, they didn't.

24        Q.    Was there any prior agreement, Agent Cox, to allow

25   this other vehicle to leave the area?

26        A.    No, sir, there wasn't.  We tried to get it.

27        Q.    Well, you testified, Agent Cox, that you were

28   present at -- after the veh -- after the van had been

163

1    stopped, correct?

2        A.    Yes, sir.

3        Q.    And you testified that you saw the individuals

4    from the van get out of the van; is that correct?

5        A.    No, sir.

6        Q.    They were already out of the van when you got

7    there?

8        A.    Yes, sir.

9        Q.    Did you recognize any of those individuals?

10       A.    Yes, sir.

11       Q.    And did you recognize Mr. Ayon?

12       A.    Yes, I did.

13       Q.    Well, isn't it true, Officer, on the evening, you

14   asked Mr. Ayon if his name was Tony?

15       A.    Yes, sir, it was -- Yes, I did.

16       Q.    And --

17       A.    Well, no.  No, I didn't.  I -- I don't think I

18   phrased it as a question.  He was walking back across the

19   street.  I actually used two names.  First, I called out the

20   name "Eric," and he turned around and looked at me.  Then he

21   continued to walk away, and I called out the name "Tony."

22   He turned around again.

23       Q.    Well, there were other officers present at the

24   time that you did this; isn't that correct?

25       A.    There were other agents there.

26       Q.    Did any of the other agents observe what you've

27   just described?

28       A.    I don't know.

208

1              IN THE SUPERIOR COURT OF CALIFORNIA

2                     COUNTY OF HUMBOLDT

3                 HON. TIMOTHY P. CISSNA, JUDGE

4                          .  .  .

5    THE PEOPLE OF THE STATE OF CALIFORNIA,

6                     Plaintiff,          Superior Court

7    vs.                                  No. CR982332DS

8    MANUEL NUNES MARTINEZ,

9                     Defendant.

10   _____/

11                   R E P O R T E R ' S

12                   T R A N S C R I P T

13                        O F

14            I N  C A M E R A  H E A R I N G S

15                        .  .  .

16               WEDNESDAY, JULY 1, 1998

17                        .  .  .

18   PAGES 208 TO 233 CONTAINED IN A SEPARATE, SEALED TRANSCRIPT

19                        .  .  .

20

21

22

23

24

25

26

27

28

1        TUESDAY, JULY 7, 1998 -- 8:59 A.M.

2                    . . .

3            THE COURT:  Court calls the case of People versus

4    Aguirre, Ayon, Madueno, Martinez and Mora.  Each of the

5    defendants are present.  Each of the defense attorneys are

6    present.  The three interpreters that were appointed

7    yesterday are present.  Also present is the interpreter

8    Ruben Segura.  He has completed the qualifications of a non-

9    certified interpreter form which has been filed.  That form

10   has been reviewed and the finding of provisional

11   qualifications and order of the presiding judge has been

12   signed.  As indicated yesterday, the certification of

13   unavailability of certified interpreters has been filed.

14   Mr. Segura is not a certified interpreter.  In this matter,

15   I make a finding of good cause to use a noncertified

16   interpreter.  And I make the further finding that the

17   proposed interpreter is qualified to interpret the

18   proceeding.

19           Mr. Clanton, do you have any objection to Mr.

20   Segura serving as the interpreter for your client, Mr. Ayon?

21           MR. CLANTON:  No, I do not, Your Honor.  I have

22   considerable experience with Mr. Segura.  I know that he is

23   a -- a very good interpreter.  I have no question of his

24   services.

25           THE COURT:  Thank you.  He is then appointed to

26   interpret for Mr. Ayon through the duration of these

27   proceedings.

28           With respect to the motion originally filed by Mr.

1   Eannarino and joined by all counsel or all parties to
2   disclose the informants and for related discoverable
3   materials and to unseal the sealed portion of the affidavit
4   in support of the search warrant, I make a finding that all
5   three of the confidential informants are not material
6   witnesses because there is no reasonable possibility that
7   failure to disclose might deprive the defendant of a fair
8   trial.  I make the further finding that good cause exists to
9   keep sealed the previously sealed portion of the affidavit
10  in support of the search warrant in that the sealing is
11  necessary to preserve the confidentiality of the
12  confidential informants' identity.  And, therefore, that
13  motion is denied.

14          As to the motion to suppress which was originally
15  filed by Mr. Eannarino and joined in by all parties, Deputy
16  McCollister made a traffic stop on the vehicle in which the
17  five defendants were riding.  While this is technically an
18  arrest, it has been held to be treated as a temporary
19  detention for Fourth Amendment purposes.  Therefore, there
20  must be a showing of a reasonable suspicion under all of the
21  circumstances that the person or persons are or have been
22  engaged in criminal activity.  In this case, law enforcement
23  had information from three confidential informants that
24  Mexicans from Fresno were involved in the manufacture of
25  methamphetamine at the Casey residence, although that
26  information was somewhat dated.  They further had
27  information that the Casey residence is in a very secluded
28  area of a remote part of Humboldt County with no other

253

1    residences on that road; that the van in question was parked
2    late at night on the road below the Casey residence, below
3    the portion which would require four wheel drive; that the
4    vehicle was rented in Fresno; and that the vehicle left late
5    at night, originally drove eastbound and then turned around
6    and headed west.

7            Under these circumstances, I find that the
8    officers had a reasonable suspicion that the occupants in
9    the van had been involved in criminal activity.  I further
10   find that the requirements of the Harvey-Madden Rule were
11   satisfied by a sufficient showing of reliability of the
12   informants -- excuse me -- by a sufficient showing of
13   reliability of the information.  After the initial stop, the
14   officers gained the following additional information:
15   First, that three of the occupants were persons who had been
16   identified as having been involved in the manufacture of
17   methamphetamine from previous information and that one of
18   the occupant's clothing had stains and burn holes which were
19   consistent with the manufacture of methamphetamine.  I,
20   therefore, find that the officers had probable cause to
21   arrest the vehicle occupants for a felony.  The motion is
22   denied.

23           The next subject I'd like to discuss is whether
24   counsel have had an opportunity to discuss with their
25   clients whether we are going to try to keep from the jury
26   the fact that these defendants are in custody.  And it
27   would, of course, take agreement by all that that fact would
28   be disclosed.  And I would admonish the jury in that regard.

269

1        MONDAY, JULY 13, 1998 -- 8:46 A.M.

2                    . . .

3        THE COURT:  Good morning.  We are in session in

4   People versus Aguirre, Ayon, Madueno, Martinez and Mora.

5   Everyone is present.

6        First thing that we need to deal with is the issue

7   of the leg restraints.  I would make the initial

8   observations that in this courthouse there is not any

9   courtroom security, meaning there's no metal detectors or

10   guards or anyone else at the doors nor is there any security

11   for this individual courtroom that we're in.  I would also

12   note the obvious, that we have five defendants in the case.

13   Each of them are held in custody on high bail facing serious

14   charges and potential lengthy prison sentences.  I would

15   also note for the record that there are two exits from the

16   courtroom in addition to the door to the judge's chambers.

17   Near the rear exit of the courtroom is an exit from the

18   building approximately ten feet away from the rear exit of

19   the courtroom.  It is proposed that each of the defendants

20   wear a leg brace, which is a device that's worn under the

21   clothing.  It is described to me as a device that when the

22   person straightens their leg completely, it would lock.  And

23   that if a person attempted to run in that, the leg brace

24   would then lock, making it so as to one leg they would have

25   to run stiff-legged, which would impede their ability to run

26   other than a slow pace.  The leg braces are not visible to

27   anyone.  And while -- when a person is wearing one and is

28   walking, there may be some very faint noise in the form of a

270

1    clicking type sound, or it may appear that they're walking a

2    little bit oddly.  None of these defendants will be walking

3    in the presence of the jury.  Or if that becomes the issue

4    at some point such as if they were to testify, either it

5    could be removed during that period or they could be seated

6    in the witness chair or some sort of arrangements could be

7    made so they would not be walking in the presence of the

8    jury.  I would also note that each of these defendants have

9    appeared in front of me on numerous occasions both since we

10   started this trial as well as before the trial for

11   arraignment, bail/O.R. hearings and such, and at no time

12   have any of the defendants done anything in the presence of

13   myself that would be inappropriate in the courtroom.  I

14   think Mr. Cater said last week that each of the defendants

15   have been perfect gentlemen.  That is true.  They have to

16   date in court.

17        With that -- or those preliminary comments in

18   mind, we would ask Dana Burr to please come forward and be

19   sworn by the clerk.

20

21                    DANA AARON BURR

22               after having been first duly

23               sworn, testified as follows:

24

25                      EXAMINATION

26   THE COURT:  Please state your name.

27   THE WITNESS:  Dana Aaron Burr.

28   THE COURT:  What is your business or occupation?

271

1          THE WITNESS:  I'm a sergeant with the Sheriff's

2     Office.  I work Court Services Division.

3          THE COURT:  Do you have some supervisory capacity

4     in that regard?

5          THE WITNESS:  Yes, I do.

6          THE COURT:  It's my understanding you have made a

7     determination from your department that you would like to

8     have each of the defendants in this case wearing a leg

9     brace?

10          THE WITNESS:  That's true, Your Honor.

11          THE COURT:  First, would you describe for us the

12     leg brace?

13          THE WITNESS:  The leg brace is just a steel and

14     vinyl brace with some cloth that makes a small clicking

15     noise if it's not lubricated.  It will slow the individual

16     down and actually lock if a person decides to run.

17          THE COURT:  How is it worn?

18          THE WITNESS:  It's worn from the knee on down to

19     the ankle.

20          THE COURT:  Is there any portion of it that comes

21     above the knee?

22          THE WITNESS:  Just a small portion so the locking

23     device will lock the knee in place.

24          THE COURT:  Can you tell us the grounds upon which

25     your office has made the determination you'd like the

26     defendants to wear a leg brace?

27          THE WITNESS:  Your Honor, it is a policy of the

28     office that in-custody trials that all in-custodies that are

272

1    going to trial wear a leg brace.  We've been doing that for

2    the last couple of years.  And we haven't had any problems

3    with any particular defendants as far as a jury being

4    concerned about what they're wearing.  In fact, I don't

5    believe any of the jurors even know they're wearing them.

6              THE COURT:  Is there anything about the -- any or

7    all of these particular defendants that makes you want them

8    to wear a leg brace?

9              THE WITNESS:  Yes, Your Honor.  This -- this case

10   has five defendants.  There's one officer.  There's a safe

11   ratio normally for in-custodies.  That is two officers per

12   defendant.  In this case, there's five and one.  It's too

13   easy for five individuals to overwhelm one or two officers.

14   And for the safety of the Court and those who use it, we're

15   requesting the brace.

16             THE COURT:  So with a ratio of two to one

17   normally, you'd want ten officers present in the courtroom

18   for the five defendants?

19             THE WITNESS:  Well, throughout the state that's

20   the ratio, Your Honor.  Unfortunately, we don't have the

21   manpower to give you ten officers.

22             THE COURT:  I would also note that having a high

23   number of officers in the courtroom would suggest to the

24   jury that -- or may suggest to the jury that these

25   defendants are a high-security risk and that wearing leg

26   braces may be a better alternative than having a large

27   number of officers present and seated around them and

28   positioned at every doorway.

273

1    Sergeant Burr, is there anything else that you

2    would like to add?

3    THE WITNESS:  No.  I can't think of anything.

4    THE COURT:  Mr. Gallegos, do you have any

5    questions?

6

7    CROSS-EXAMINATION

8    MR. GALLEGOS:  If I may, I do.  I do, Your Honor.

9    Do you know of any escape attempts by Mr. Aguirre?

10   A.    No, Your Honor -- or, no.  Excuse me, counselor.

11   THE COURT:  Let's fashion these questions such as

12   that -- as to each of the defendants unless there's

13   something particular with the individual.  That way we don't

14   have to repeat them five times.  So do you know of any

15   escape attempts by any of the defendants?

16   THE WITNESS:  No, Your Honor.

17   MR. GALLEGOS:  Do you know of any disruptive

18   behavior in the jail by any of the defendants?

19   A.    Not at this time, no.

20   Q.    Do you know of any disruptive behavior by any of

21   the defendants while they've been in court?

22   A.    Not at this time, no.

23   Q.    Do you know of any escapes by any of the

24   defendants from custody?

25   A.    It's obvious all five of them are still here.

26   Q.    Any attempted disruptive behavior you know of?

27   A.    Not that I know of.

28   Q.    Either in court or in the jail?

274

1     A.    Not that I'm aware of.

2     Q.    Have you ever worn one of these leg braces?

3     A.    No, I haven't.

4           THE COURT:  Mr. Clanton.  Mr. Clanton.

5

6                      CROSS-EXAMINATION

7           MR. CLANTON:  Good morning, Sergeant Burr.  Have

8     you had the opportunity to review the criminal history of

9     any of the defendants?

10    A.    No.  My understanding that some of them are not

11    American citizens, so, therefore, I don't have any facts of

12    the country they came from.

13    Q.    In fact, you have no information regarding any

14    past assaultive conduct on behalf of any of the defendants,

15    do you?

16    A.    None that I know of, no.

17          MR. CLANTON:  No further questions.

18          THE COURT:  Mr. Eannarino.

19

20                      CROSS-EXAMINATION

21          MR. EANNARINO:  Thank you, Your Honor.

22          Good morning, Sergeant Burr.  Are you aware of the

23    facts of the original arrest of these individuals?

24    A.    Pardon me.  There's a lot of background noise.

25    Could you be a little louder, please.

26    Q.    Sure.  I can move over.  Are you aware of the

27    facts of the original arrest of these individuals?

28    A.    Yes, I am.

277

1    Court.

2            THE COURT:  The Court.  I asked Sergeant Burr to

3    appear because I was informed that he was the one that had

4    made the decision or policy on behalf of the department that

5    these defendants should wear leg braces.  He wasn't

6    subpoenaed.

7            MR. ROBINSON:  What is -- you indicated that

8    you're a sergeant with the Humboldt County Sheriff; is that

9    right?

10   A.      Yes, sir, I am.

11   Q.      And is -- is your decision to have all of the

12   defendants wear the leg brace, is that a policy of the

13   Humboldt County Sheriff?

14   A.      That's the policy of the Humboldt County Marshal's

15   Office.  And my understanding, the policy of the sheriff is

16   if the supervisor decides they are to wear a brace, that's

17   what it should be.

18   Q.      The decision to have all of the defendants wear

19   leg braces in this trial, was that decision made as a

20   request as an individual basis by supervisors within the

21   Humboldt County Sheriff's Department?

22   A.      I'm not sure I understand your question.

23   Q.      Did anyone in the jail request that these

24   defendants be -- wear the leg brace during this trial?

25   A.      Nobody in the jail.  They wouldn't make that

26   decision.  It would be mine.

27   Q.      You indicated in testimony from His Honor that it

28   was the policy of your office -- the policy of the Marshal's

278

1    Office.   Is that policy written down?

2        A.    No.   It's an unwritten policy.

3        Q.    How long has that policy been in effect?

4        A.    Since I've been on the floor for the last

5    twenty-four months, it's been done probably a hundred

6    percent of the time.

7        Q.    What was the genesis of that policy?   Whose

8    decision was it that -- that such a policy should be

9    imposed?

10       A.    Well, it's just a matter of all inmates who are in

11   custody looking at a lot of time, if they're found guilty,

12   there's a higher risk towards the end of their case to

13   escape.   Instead of having to fight these people, it's much

14   easier for the officer and for the security of the court,

15   the safety of all those who use it, we put 'em in a brace.

16       Q.    I understand that.   My question is what was the

17   decision to write the policy?  How did that come about?  Was

18   there a meeting of the Marshal's staff?

19       A.    There was a meeting amongst the supervisors, yes.

20       Q.    And when did that meeting happen?

21       A.    You want a date, a month, an hour, or what?

22       Q.    Yes, as near as you can.

23       A.    Probably twenty-four months ago.

24       Q.    Two months ago?

25       A.    Twenty-four probably.

26       Q.    And during the last two years, how many of the

27   defendants in jury trials who are in custody have worn the

28   leg brace?

1   decide to go there sooner instead of later is quite acute.

2   The means of countering that which is proposed, the wearing

3   of leg braces beneath the clothing, leg braces which each

4   defendant can walk around with is quite reasonable.  Indeed,

5   there's no reason to suspect that the jurors will know that

6   they are restrained.  And the restraints are such that they

7   will not impair the defendants' ability to cooperate with

8   their attorneys and to assist in the presentation of their

9   own defenses.  I think that the security measures as in

10  place are reasonable and should remain.

11           THE COURT:  In this matter, I do make a finding

12  that there is a manifest necessity for additional security.

13  I base that primarily upon the facts that there are five

14  defendants, the seriousness of the charges, the lengthy

15  potential prison sentences, the fact we've been

16  experimenting with various seating arrangements  -- we now

17  have two of the defendants sitting in the audience section

18  of the courtroom with attorneys and interpreters, one on one

19  side of the aisle, one on the other side of the aisle.  We

20  have two defendants seated at counsel table.  We have one

21  defendant seated behind the counsel table with his attorney

22  and interpreter in front of the bar.  Nothing that has been

23  presented would indicate that the use of the leg restraints

24  would in anyway interfere with the defense of this matter on

25  behalf of any of the defendants.  There appears to be no

26  prejudice whatsoever to the defendants in terms of the jury.

27  I think that putting up a temporary metal detector outside

28  the courtroom would be prejudicial.  I think that adding

305

1   additional security in the terms of persons to the courtroom

2   would be prejudicial, even if some of them were in

3   plainclothes.  It would be pretty obvious over a six-week

4   trial as they're seated there.  And I'd also note that we're

5   only going to be in session half days, from eight thirty to

6   twelve.  So the uncomfortableness wouldn't be extreme.  In

7   fact, the person that testified, Mr. Aguirre, says it

8   doesn't get more uncomfortable during the times he's wearing

9   it.  He says it's only a little bit uncomfortable.  I think

10  the need outweighs that.  So that's my finding as to that

11  issue.

12                          .  .  .

13                  (Jury selection commenced, reported but not

14  transcribed).

15                          .  .  .

16                  (Day's proceedings concluded at 12:03 p.m.).

17                          .  .  .

18

19

20

21

22

23

24

25

26

27

28

15( .

1        AFTERNOON SESSION -- 4:11 P.M.

2              . . .

3        THE COURT:  Court calls People versus Aguirre,

4   Ayon, Madueno and Martinez.  All defendants, counsel, and

5   interpreters are present.  This is the time set for argument

6   on the motion to traverse the search warrant.

7        We will start with Mr. Eannarino.

8        MR. EANNARINO:  Thank you, Your Honor.  Without

9   reiterating the issues raised in my motion, I would simply

10  at this time renew my -- our 1538 point 5 suppression motion

11  and incorporate both the motion and the testimony the Court

12  heard into our search warrant motion at this time.  Clearly,

13  I think just to briefly reiterate the search warrant motion,

14  the search warrant affidavit was based on stale information.

15  As the Court is aware, the last information obtained was

16  January of '97.  It was not verified.  And yet not acted

17  upon until April 15th when the officers went out there.  The

18  officers' presence at the Casey residence was based solely

19  on what was discovered in the van.  And that issue, of

20  course, would be covered by the renewal of the search -- of

21  the 1538 point 5 motion.  It is our argument, also, any

22  consent given by Mr. Casey was certainly coerced by the

23  circumstances.  And the remaining false, or at least

24  reckless, information as outlined in my motion, I think, is

25  detailed by a review of the affidavit.

26        We would submit it on that, Your Honor.

27        THE COURT:  Does any defense counsel want to add

28  to that?  I will be -- first, I guess we should ask whether

1505

 1   the other defense counsel join in the motion?  I don't have

 2   the file in front of me.  I think there have been some

 3   written joinders.  But let's clarify that for the record.

 4          Mr. Clanton.

 5          MR. CLANTON:  Well, Your Honor, I can't recall if

 6   I filed a written joinder.  But in any event, we would be

 7   joining and putting that on the record at this point.

 8          THE COURT:  Mr. Cater.

 9          MR. CATER:  I have filed a written joinder.  I'll

10   do it orally at this time, Your Honor.

11          THE COURT:  Mr. Gallegos.

12          MR. GALLEGOS:  We did also, Your Honor.  We would

13   also join at this time orally.

14          THE COURT:  Now, let me ask -- we'll just start

15   over here -- Mr. Clanton, do you have anything additional

16   you'd like to add for the record?

17          MR. CLANTON:  No, Your Honor.  We would be

18   adopting Mr. Eannarino's comments.

19          INTERPRETER TORRES:  Your Honor, if -- if the

20   attorneys speak that direction, it's very difficult to hear

21   what they're saying.

22          THE COURT:  They're speaking to me like they

23   normally would.  Would you all -- I can hear you fine --

24   address your comments that way, please.

25          Mr. Cater.

26          MR. CATER:  Nothing to add, Your Honor.

27          THE COURT:  Mr. Gallegos.

28          MR. GALLEGOS:  No, Your Honor.  We would join in

1    Mr. Eannarino's comments.  And we don't have anything to add
2    at this point.

3            THE COURT:  Mr. Keat.

4            MR. KEAT:  Thank you, Your Honor.

5            It's the People's position that the defense
6    counsel has failed to make the substantial preliminary
7    showing which is required by the cases cited in the People's
8    papers.  Motion to traverse essentially pleads that the
9    affiant lied when he applied for the search warrant.  Once
10   the search warrant is issued, the defense has to make a
11   showing before it can bring that claim forward.  He hasn't
12   made that showing.  Many of the issues that have to deal
13   with that have previously been addressed by the Court in the
14   in-camera hearing, which was held previously, and in the
15   previous motion to suppress.

16           These defendants lack standing to assert Mr.
17   Casey's rights because they have no reasonable expectation
18   of privacy at the Casey residence.  They cannot complain of
19   any infringement upon Mr. Casey's rights at that place.  Mr.
20   Casey consented to a search.  The independent source
21   doctrine would apply regardless of any defect in the
22   warrant.

23           In this case, there was a Hobbs seal on a portion
24   of the search warrant which contained additional information
25   besides that which was in the rest of the affidavit and
26   besides that which the Court heard in camera.  Even if the
27   defense counsel were capable of proving -- proving up the
28   defects they claim in the affidavit, the rest of the

1    affidavit contains probable cause nonetheless.  The warrant

2    is presumed to contain probable cause.  I think that based

3    upon the Court's review of the material within that Hobbs

4    seal, and within the affidavit in its entirety, that there

5    is probable cause despite any defect that may be claimed or

6    that the Court may have seen as it held its hearings.

7           We think that the defendants' motion to traverse

8    the warrant should be denied.

9           THE COURT:  Mr. Eannarino, anything further?

10          MR. EANNARINO:  Just briefly, Your Honor.

11          This is the first time we've heard the standing

12   issue.  I would respectfully direct the Court to the case of

13   Cecil Jones versus United States, 362 U.S. 257 at 263.

14          THE COURT:  Okay.

15          MR. EANNARINO:  The bottom line of that case --

16          THE COURT:  Stop.  Stop.  We don't have your speed

17   limit sign here.  It still applies, essentially, when you're

18   trying to give me a cite.  So try that again.  Cecil

19   Jones --

20          MR. EANNARINO:  Cecil Jones versus United States,

21   362 U.S. 257 at 263.

22          THE COURT:  Thank you.

23          MR. EANNARINO:  The essence of that holding is

24   that a defendant charged with a violation of narcotics laws

25   has standing to contend that entry and subsequent seizure

26   were unlawful notwithstanding his testimony that the

27   property seized was not his and that the place of arrest was

28   not his home.  That's just a summary of the headnotes.  But

1508

1    that's -- that's the essence of the holding.   To address the

2    standing issue, I present that case.

3              We would submit it.

4              MR. KEAT:   That's no longer the law, Your Honor.

5              THE COURT:   Matter submitted?

6              MR. GALLEGOS:   Yes, Your Honor.

7              MR. KEAT:   Submit the matter.

8              THE COURT:   See everyone eight thirty tomorrow

9    morning.

10             (Day's proceedings concluded at 4:19 p.m.).

11                            .  .  .

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1848

1       MONDAY, AUGUST 17, 1998

2                   . . .

3              THE COURT:   The Court calls People versus
4    Aguirre, Ayon, Madueno, and Martinez.   Everyone is
5    present.   The jurors are not present.

6              I have some questions about jury
7    instructions that we need to go over.   First, a
8    couple of rulings on the motion to traverse, that
9    motion is denied.   I don't find that there was any
10   showing of any intentional material, false statements
11   in the affidavit.   I find that the information in the
12   affidavit was not stale based on the entire, entire
13   affidavit.   I find that Mr. Casey's consent was not
14   coerced and further that the defendants in any event
15   have not made a showing of standing to object to a
16   search at the Casey property.

17             As to Exhibit 76, Mr. Keat submitted brief
18   argument that it would fall within an exception to
19   the hearsay rule as an official record.   I don't
20   recollect whether the testimony was and didn't
21   understand whether that was a summary that was
22   prepared for trial or whether that was a summary that
23   was prepared as part of the witness's work.   If it
24   were a summary that were prepared as part of his
25   work, it might be an official work.   If it was a
26   summary that was prepared for trial, then it would
27   not.

28             MR. CATER:   I think the testimony was, your

```
 1                    WEDNESDAY DECEMBER 9, 1998 - 1:30 P.M.

 2                              .  .  .

 3               THE COURT:  People versus Jose Alberto Ayon.

 4    CR982332BS.

 5               He's present with his attorney Mr. Clanton.

 6               Mr. Segura is present as the interpreter.

 7               You've previously been sworn and acted as

 8    Mr. Ayon's interpreter throughout the case.  You understand

 9    you're still under that oath?

10               THE INTERPRETER:  I do, your Honor.

11               THE COURT:  This is the time set for sentencing.

12               Mr. Clanton, do you waive arraignment for

13    judgment?

14               MR. CLANTON:  So waived, your Honor.

15               THE COURT:  On August 28, 1998, the defendant

16    was found guilty of a violation of Health and Safety Code

17    Section 11379.6 with the enhancement of more than ten pounds

18    under Health and Safety Code Section 11379.8.

19               He was also found guilty of violation of Penal

20    Code Section 182, and Health and Safety Code Section

21    11374.5.

22               Is there any legal cause why judgment and

23    sentence should not now be pronounced?

24               MR. CLANTON:  No, your Honor.

25               THE COURT:  Mr. Ayon, do you know any reason you

26    should not be sentenced today?

27               THE INTERPRETER:  No.

28               THE COURT:  The probation officer submitted a
```

1   report which was filed on September 23rd, 1998.  That report

2   consists of eleven pages, plus a one page statement of

3   criteria affecting probation, a one page statement of

4   circumstances in aggravation and mitigation, and a one page

5   letter from Mr. Keat.  I have also received a four page

6   letter from Mr. Clanton.

7             I have read and considered the report and it's

8   attachments, and the other items that I mentioned.  There

9   have been no formal statements of aggravation or mitigation

10  filed.

11            Does the defendant waive the filing of a formal

12  statement of mitigation, other than the letter you

13  submitted, Mr. Clanton?

14            MR. CLANTON:  No.  The letter I submitted will

15  suffice as my statement of mitigation, your Honor.

16            THE COURT:  My tentative decision in this matter

17  is to follow the recommendation of the probation officer as

18  I've stated in sentencing for the codefendants, and as I'll

19  briefly reiterate now.

20            The reasons for those decisions are under Rule

21  410 of the California Rules of Court.  The objectives of

22  sentencing include protection of society, punishing the

23  defendant, and deterring others from criminal conduct by

24  demonstrating it's consequences.

25            It would appear that based on the evidence, the

26  amount of methamphetamine manufactured in this single

27  operation likely generated approximately ninety thousand

28  tenth of a gram doses, under those circumstances it seems

1    that the recommendation would be appropriate.

2                Mr. Ayon, is there anything you would like to

3    say before I sentence you?

4                MR. CLANTON:  I believe that Mr. Ayon is going

5    to subordinate his comments to mine, your Honor.

6                THE COURT:  Okay.  In this matter it appears

7    that under Penal Code Section 1203.073(b)(3) probation can

8    be granted in this case only if it is found to be an unusual

9    case.

10               Mr. Clanton, do you have any comments on whether

11   or not this is an unusual case?

12               MR. CLANTON:  Yes, I do, your Honor.

13               I think that on two accounts I believe it is an

14   unusual case.  First, the age of Mr. Ayon.  He is a young

15   man.  And that the likelihood of this type of offense

16   occurring in the future, I think, is very low.  I do not

17   believe he represents a danger to the community.

18               Your Honor heard the testimony in this case.

19   And I think it was clear that not only Mr. Ayon, but his

20   codefendants all played a very minor role in these

21   activities.

22               I think that the manner in which individuals

23   like Mr. Ayon get put in this position is based on pure

24   financial incentive.  I believe that to some degree the

25   individual such as Mr. Ayon and his codefendants are brought

26   into these activities without a clear understanding of

27   exactly what are the ramifications of the law should they be

28   found out.  And I believe that the -- their economic hard-

1    ships that they are facing induce them into this type of

2    activity, and that they are, in fact, induced to these

3    activities.

4         And I believe for all of those reasons Mr. Ayon

5    is like his -- counsel for his codefendants argued before

6    your Honor, do not represent a danger to the community.

7    They were opportunistic, that is true, on a financial level.

8    But I think that the true seriousness of this offense, the

9    impact on their lives has made a very big imprint. And it

10   is extremely unlikely that these individuals, Mr. Ayon

11   specifically, would be involved in this type of activity

12   again.

13        And for those reasons, your Honor, I believe

14   that there are unusual circumstances.

15        THE COURT: Mr. Keat?

16        MR. KEAT: As to unusual circumstances, your

17   Honor, there is no circumstance of this defendant or of the

18   offense which qualifies under Rule 413 as an unusual

19   circumstance.

20        THE COURT: In reviewing Rule 413, I do not find

21   any circumstances that would suggest that this is an unusual

22   case. And therefore probation is denied.

23        As to the prison term to be imposed,

24   Mr. Clanton, do you have any comments?

25        MR. CLANTON: Well, your Honor, I did have some

26   comments before your Honor makes it's ruling with regard to

27   probation specifically.

28        THE COURT: Go ahead.

1          MR. CLANTON:  Your Honor, I know that the Court

2    has been put in this position on three prior occasions and I

3    joined in support of the other counsel in their request that

4    the 11379.8 enhancement be dismissed by your Honor under the

5    C paren three paren D of that same code section.

6          The Court has the ability to do that, has the

7    discretion to do that, and I think it's incumbent of me to

8    put it on the record at this time that request.  I know that

9    your Honor has not seen fit to do that in the other cases

10   and is unlikely to do it here, but I would ask that the

11   Court consider doing that in view of the following:

12         The fact again without reiterating all of my

13   comments earlier with regards to Mr. Ayon's age or all of

14   those comments which are contained in my four page letter

15   which, in fact, is my letter in my statement of mitigation

16   to the Court.  Mr. Ayon is a young man who has a young

17   family.  He has two young children, one which was born

18   shortly after this trial.  His wife is a citizen of the

19   United States.  She needs his support and to some degree the

20   desire to provide for his family was very much a part of his

21   inducement into participating in these activities on the

22   level that he did.

23         The individuals involved here, Mr. Ayon

24   specifically, received very little, if anything as a matter

25   of fact as it turned out, in turn for their participation in

26   these activities.  They were not involved in a hierarchy.

27   They were not involved in any major decision making

28   processes.  And they are not in that sense substantially

1    linked to the activity.

2             They were involved, yes, it's undisputed, but I

3    think the Court should look at the nature of their

4    involvement.  Certainly methamphetamine is a scurge in our

5    society.  That's undisputed.  I think that it is something

6    that Mr. Ayon has been made aware of just how society views

7    that particular drug and it's effects on society.

8             In all honesty, I don't think he had much

9    interest in considering or contemplating those facts prior

10   to his arrest, that would be true, but not out of any

11   contempt for society or the Court or the law, but simply

12   because it was really not that much a part of his world.

13   He's interfaced with a world and society that takes an

14   extremely dim view, and rightfully, of that.

15            I think he's absorbed that lesson and certainly

16   if the Court took into account all of those factors, I think

17   that the Court could very easily find it's way toward

18   dismissing that enhancement under the appropriate section.

19            THE COURT:  Mr. Keat?

20            MR. KEAT:  The Court can dismiss the enhancement

21   allegation in the interest of justice.  The statute which

22   provides additional punishment was intended for offenses and

23   offenders just such as that we have here.

24            This is a high output lab which deserves a

25   greater punishment.  There is nothing about this defendant

26   which argues for mitigation.

27            The request to strike the allegation should be

28   denied.

1          THE COURT:  Request is denied.

2          Let me make two comments in that regard:  First

3   is that not only do I not think there are mitigating factors

4   in this case, I think there's the opposite, as I've stated

5   in response to the motion filed by the codefendants.  And

6   that the enhancement is for manufacturing ten pounds or more

7   of methamphetamine.  And in this instance the evidence was

8   clear that on this particular single occasion approximately

9   twenty pounds were manufactured, twice the amount for which

10  this enhancement would otherwise apply.

11         And the other comment I have is to relate a

12  story that I guess summarizes my feelings about this case.

13  And that was a couple of days ago during a trial I had the

14  occasion to have an elementary school class sit in on part

15  of that trial.  And when we took the morning recess the

16  class stayed and asked if I would answer some questions.

17  And I don't know, they were probably fourth or fifth

18  graders.  And one of the young children asked me about drugs

19  and what part did drugs play in the cases that I see.  And

20  the bottom line response I gave those children was that if

21  there were no drugs, I probably wouldn't have a job because

22  we wouldn't need anywhere near as many judges.

23         And I think that echoes what Mr. Clanton

24  indicated in his closing argument in this case about what

25  his case load as a criminal defense attorney would be if

26  there were no drugs.  It is a terribly serious problem.

27         And as indicated in the sentencing objectives,

28  we want to send a message about what the consequences of

1    that will be.

2            Now, I'm not naive and think that this sentence

3    is going to mean that there won't be any more

4    methamphetamine manufactured in this state, let alone this

5    county.  But the message should be clear that anyone that

6    decides to do that in Humboldt County will suffer severe

7    consequences if they're convicted.  And therefore, the

8    motion to strike the enhancement is denied.

9            Now, Mr. Clanton, do you have comments regarding

10   the prison terms?

11           MR. CLANTON:  Your Honor, I think my comments

12   contained in the statement of mitigation would be

13   reiterated.  At this point I would rest upon those.

14           THE COURT:  Mr. Keat?

15           MR. KEAT:  The only thing this defendant had

16   different than the other defendants is he didn't take the

17   stand and lie.  I think he deprived himself of the benefit

18   of that when he lied to the probation officer when making

19   the ridiculous statement that he found the stained pants on

20   the side of the road.

21           The other thing that this defendant has

22   different than the other defendants is he has a prior felony

23   drug conviction.

24           The aggravated term is appropriate.

25           MR. CLANTON:  If I may, just a brief comment

26   based on that, your Honor?

27           THE COURT:  You may.

28           MR. CLANTON:  I would simply indicate to the

1    Court that I hear loud and clear the Court's desire to send

2    a message to individuals who may be involved in trafficing

3    in controlled substances in this county.

4           I would just indicate to the Court, your Honor,

5    that people swayed like Mr. Ayon and the other three

6    defendants in this case are individuals with very little

7    education who come from back- grounds of extremely limited

8    resources and are not worldly in any sense of the

9    imagination.

10          And they are preyed upon by individuals who

11   understand that and can, in fact, put before them more money

12   than they have ever seen but, in fact, would not by typical

13   middle class American standards be all that much.  And they

14   are induced in that manner, your Honor, and they are

15   individuals who are not going to be reading Court records,

16   who are not reading newspapers, who are not part of

17   mainstream American society, or California society for that

18   matter.  And while the message is an admirable one, I think

19   that the Court needs to think about how these individuals

20   came to be involved.  And it is not done out of a

21   greediness.  It's not done out of any malevolent

22   opportunism.  It's done out of need.  And to some degree

23   desperation and the inducements which are laid before them.

24          And that's extremely unfortunate that they pay

25   the price for those type of circumstances.  And I think that

26   the Court should take into account those factors because

27   they're very real.  They're at the very foundation of the

28   problem, that these activities cannot take place without a

1    work force, the work force that's generated in the manner

2    that I've indicated to the Court.

3            And I would ask the Court to consider that as

4    certainly a mitigating aspect of this case.  And certainly

5    it's true for Mr. Ayon.

6            THE COURT:  Well, I consider that, but it seems

7    to me that in cases such as this, the motivation is to make

8    a very substantial amount of money in a very short period of

9    time.  And the environment and our society suffers when they

10   do that.  And when they make that choice, then our

11   legislature has indicated what the punishment should be.

12   And what I do is follow the law.

13           In reviewing Rule 421, I find the following

14   circumstances in aggravation:  The defendant will be

15   convicted of other crimes for which consecutive sentences

16   could have been imposed, but for which concurrent sentences

17   are being imposed under A-Seven.

18           A-Eight, the particular crime indicates planning

19   and sophistication.

20           A-Nine, there was considerable damage inflicted

21   in the case.

22           And A-Ten, there was a large quantity of

23   contraband.  And I'm referring to the second ten pounds over

24   and above the enhancement.

25           And under B-Two, the defendant's prior

26   convictions are of an increasing seriousness.

27           I don't find any circumstances in mitigation.

28           And, therefore, I find that the aggravating

1    factors outweigh the mitigating factors.  And I impose the
2    upper term of seven years.

3            For the enhancement under Health and Safety Code
4    Section 11379.8 sub-paragraph A, sub-paragraph three, I
5    impose an additional ten years which will be consecutive to
6    the sentence in Count One.

7            On Count Two I impose the aggravated term of
8    seven years.  That is stayed pursuant to Penal Code Section
9    654.

10           As to Count Three, I impose the aggravated term
11   of four years and order that it be served concurrently
12   because I determine that the offense occurred at the same
13   place and time and had the same criminal objective.

14           Therefore, it is the judgment and sentence of
15   the Court that you serve seventeen years in the State Prison
16   for the violation of manufacturing methamphetamine with the
17   enhancement as stated.

18           Has anyone calculated the credits to date?

19           MR. CLANTON:  I apologize, your Honor, I have
20   not done that.

21           THE COURT:  I have not either, but give me just
22   a moment and I will do that.  I've done it so many times
23   that I didn't do it today.

24           The defendant is entitled to two hundred
25   twenty-three days credit for days actually served.  One
26   hundred and ten days credit under Penal Code Section 4019.
27   For a total of three hundred and thirty-three days.

28           You are ordered to pay a restitution fine in the

Jose Avon P-20590
P.O. Box 6000 B6-117
DElano CA 93216

LEGAL MAIL



RECEIVED

JAN 16 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

OFFICE OF THE CLERK

U.S. DISTRICT COURT

NORTHERN DISTRICT
450 GOLDEN GATE
BOX 36060
SAN FRANCISCO CA 94102-3434



UNITED STATES POSTAGE

$ 04.90°
02 1A 0464932
MAILED FROM ZIP CODE 93215
JAN 14 2008